## ZOCCOLILLO v. OREGON SHORT LINE R. CO.

No. 3225.   Decided Dec. 6, 1918. (177 Pac. 201.)

1. CARRIERS—HEATING CARS. A carrier is only required to heat its cars so as to provide a reasonable degree of comfort for passengers in an ordinary and normal state of health. (Page 49.)

2. CARRIERS—FAILURE TO HEAT CARS—PLEADING. In an action against a carrier for injuries occasioned by a cold car, the passenger is not required to plead or prove that he is in an ordinary or normal state of health. (Page 49.)

3. CARRIERS—HEATING CARS—DEGREE OF CARE. A carrier of passengers is bound only to exercise that degree of care in endeavoring to keep its vehicles sufficiently warm which a very cautious and prudent person would exercise under the same or similar circumstances. (Page 49.)

4. CARRIERS—HEATING CARS—CARE REQUIRED. To permit a car to become so cold as to cause a passenger's feet to freeze constitutes negligence as a matter of law. (Page 52.)

5. EVIDENCE—JUDICIAL NOTICE—NATURAL FORCES—EFFECT. Courts are required to take judicial notice of all natural forces, the effect of which cannot be ignored, and that no one in ordinary or normal health can freeze his feet, when reasonably clad, unless the temperature falls considerably below 32 degrees Fahrenheit. (Page 53.)

6. CARRIERS—HEATING CARS—NEGLIGENCE—EVIDENCE. In an action by a passenger to recover damages for frozen feet, evidence *held* insufficient to sustain a finding that plaintiff's feet were frozen while on defendant's train. (Page 56.)

7. APPEAL AND ERROR—REVERSAL—DISPOSAL OF ASSIGNMENTS. Under the statutes the Supreme Court on reversal in a case is required to dispose of all of the assignments of error. (Page 57.)

8. CARRIERS—FAILURE TO HEAT CARS—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY. Whether a passenger is negligent in remaining in a cold car, and in not notifying conductor or making any complaint, is generally a question for the jury. (Page 59.)

9. CARRIERS—HEATING CARS—CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS. In an action by a passenger for damages for frozen feet, where carrier set up failure of plaintiff to complain or notify the conductor that the car was cold, as constituting contributory negligence, it was error to refuse to instruct respecting plaintiff's duty in such respect. (Page 59.)

10. NEGLIGENCE—RES IPSA LOQUITUR. The maxim of res ipsa loquitur does not raise a presumption, but merely an inference of fact, and

does not shift the burden of proof, although such an inference may be so strong as not only to justify, but to compel, a finding of negligence.[1]   (Page 60.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. Wm. H. Bramel,* Judge.

Action by Christina Zoccolillo against the Oregon Short Line Railroad Company.

Judgment for plaintiff.   Defendant appeals.

REVERSED and remanded.

*Geo. H. Smith, J. V. Lyle* and *B. S. Crow* for appellant.

*Weber, Olson & Lewis* for respondent.

FRICK, C. J.

The plaintiff commenced this action to recover damages for personal injuries which she alleged were suffered by reason of defendant's negligence in permitting a passenger car on which she was a passenger to become and be uncomfortably and unreasonably cold.

After alleging the necessary matters of inducement, and after stating how and when plaintiff became a passenger on one of defendant's passenger trains, and giving the beginning and end of her journey, she stated the cause of her alleged injuries in the following words:

"That shortly after this plaintiff so boarded said train the same started on its journey to Salt Lake City, and while plaintiff was such passenger in said car, so provided for plaintiff by the defendant, the defendant carelessly and negligently suffered and permitted said car in which plaintiff

---

[1] Citing *Williamson* v. *Salt Lake & O. Ry. Co.,* 52 Utah, 84, 172 Pac. 680; *Christensen* v. *Railroad,* 35 Utah, 137, 99 Pac. 676, 20 L. R. A. (N. S.) 255, 18 Ann. Cas. 1159; *Furkovich* v. *Bingham Coal & Lumber Co.,* 45 Utah, 89, 143 Pac. 121, L. R. A. 1915B, 426.

was a passenger as aforesaid to become cold, by means whereof the plaintiff was greatly injured, and both her feet were frozen, and her right hand was frozen, and other parts of her body became cold," etc.

She then alleges the consequences following the freezing of her feet, and the amount of damages she sustained by reason thereof, etc., and prayed for judgment.

The defendant interposed a general demurrer to the complaint, which was overruled; whereupon it answered the complaint, admitting that on the day and at the place named in the complaint plaintiff became and was a passenger on one of its passenger trains. It denied all the allegations of negligence, etc. It also affirmatively alleged that at the time plaintiff became a passenger she was not in normal health; "that she was weakened and wasted by disease and sickness;" that she was guilty of negligence in failing to provide herself with sufficient wraps and in other particulars; all of which acts and omissions were specifically set forth, and that the acts and omissions were the proximate cause of her alleged injuries.

The evidence produced on behalf of the plaintiff is in substance as follows:

That plaintiff, at the time of the injuries complained of, was twenty-two years of age, was married, and was born in Montana; that she, her husband, and her mother lived at Kalispell, Mont., until the 21st day of February, 1917; that for two weeks prior to that date plaintiff had been confined to her bed with tonsilitis and rheumatism, and had suffered with swollen feet; that she, her husband, and her mother had contemplated leaving Kalispell, Mont., to go to Helper, Utah, to live; that her sickness aforesaid detained them at Kalispell about ten days or two weeks longer than they had intended to remain there; that on the evening of February 21, 1917, she, her mother, and her husband and a young man, a friend of the family, left Kalispell about nine o'clock; that the weather was cold, with about a foot and a half of snow on the ground; that they had left the home where they had lived earlier in the day, and had stayed with a friend's family until train time, to which place plaintiff walked, the distance

being only a few blocks; that thereafter she was taken to the Great Northern station from the home of said friend in an automobile, where she boarded a sleeper on the Great Northern railway, in which she remained until they arrived at Great Falls, Mont., on the afternoon of the 22d of February; that they remained at Great Falls about two hours; that while at Great Falls plaintiff was moved about in a wheel chair when movement became necessary; that they left Great Falls about four o'clock p. m. on the 22d for Butte, Mont., riding all the way in a day coach. Plaintiff testified that while on that train she was "pretty sick." The train arrived at Butte shortly after midnight; that is, early on the morning of the 23d of February. Immediately after arriving at the Great Northern station at Butte plaintiff was taken in a wheel chair from that station to defendant's station, the two stations being about three blocks apart. Plaintiff and her relatives remained in this station during the remainder of the night, she remaining in the wheel chair. In the morning, between six and seven o'clock, she was taken to defendant's train in a wheel chair, and was assisted into the day coach by her husband, the young man who was traveling with them, and a brakeman of the defendant. Her husband spoke to the brakeman about plaintiff's condition, and asked that she be given a seat near the ladies' toilet in the day coach, which was done. After entering the car they turned over one seat, making a double seat for her next to the ladies' toilet. Her mother was in the double seat with plaintiff, and her husband and the friend took the double seat across the aisle from where she was. She was thus placed in the end of the car next to the dining car, and the opposite end from which the passengers entered and left the car in which she was riding. The entire train consisted of a baggage car, a smoking car, day coach in which plaintiff and her relatives were riding, a dining car, and a sleeper, and her husband testified that it was a solid vestibuled train.

We deem it more logical to state at this point the evidence adduced by plaintiff relative to the condition or temperature of the car in which she was riding.

In answer to her counsel she testified that in passing from the depot waiting room to the car at Butte, Mont., it was "pretty cold outside"; that the train left after she had entered the car in—

"about ten or fifteen minutes; something like that. Q. After you left there (the station) what did you notice about the temperature? A. I began to feel cold on my feet and draft getting to them. I felt cold all that time and uncomfortable, and I kept telling them I was cold. Q. Who do you mean? A. My mamma and husband; and they kept telling me to move my feet, and I kept doing that, and mamma says, 'Put them on the steam,' and I put them on the steam, but there was no steam there. * * * Q. What do you mean? A. Right on the pipes that was on the side of the car. Q. Did you feel the heat at all? A. No; there was no steam there to amount to anything. * * * You couldn't hardly feel the heat coming at all. * * * Q. How long did you continue to feel the car was cold? A. Why, until about—well, until quite late in the day. I don't know just about what time, because I never noticed the time, but it was quite late in the day."

Plaintiff further testified that her mother took off plaintiff's rubbers and her shoes, and she put her feet on the cushion of the opposite seat, and that her mother "throwed her things on, and then throwed my husband's mackinaw on them" (her feet). She also said that she wore a pair of woolen stockings, a pair of heavy tan shoes, a pair of rubbers over them, which they took off her feet when she put them on the steam pipe as before stated, and she described the other clothing worn by her. On cross-examination she further testified:

"Q. You put your feet on the opposite seat in front of you? A. Not right away after I got on (the train). Q. How long before you did? A. I didn't until quite late in the day; until I began to feel pretty cold and they took off my shoes. Q. So you didn't put your feet on the opposite seat until quite late in the day, when you began to feel pretty cold? A. Yes, sir. Q. Did you let your feet stay down? A. Yes, sir. * * * Q. As a matter of fact all the way from

Butte to Salt Lake City you were sick at the stomach and had a headache? A. Yes, sir.''

She also testified that during nearly the whole journey. from Butte to Salt Lake City she vomited about every half hour, and that all the nourishment she took after leaving Butte was a little tea and some milk. She also said she ''had a blanket right by her side,'' but that she did not use it at any time, but that her mother had put her shawl and her husband's mackinaw coat over her feet. In answer to the question as to whether she did not sleep ''most of the way'' between Butte and Salt Lake City, she said: ''No; not most of the way. I was throwing up every half hour or so. I might go to sleep in between times,'' She was also asked whether she told the conductor anything about her condition, and the condition of the car, and she said she did not, and did not know whether any one said anything to him; that she paid no attention, ''because I was sick.'' She also testified that she kept telling her mother and her husband that her feet were cold, but ''they wouldn't believe it.'' Plaintiff also testified that when they left Butte station the car was not quite half filled with passengers; that passengers kept going and coming all the day; that she did not remember how many remained in the car all day, but she did remember that one old lady who boarded the car at Butte remained therein all the way to Salt Lake City; that the old lady came to where plaintiff sat in the car and sat with her a short space of time during the trip; that she did not learn the old lady's name; that there were other women and children in the car; that she also had one finger frozen; that she had a muff with her, and that when she kept her hands in the muff they were comfortable, and that she had no idea that her feet were frozen until after she had arrived at Salt Lake City. She also said that the cars on the Great Northern were comfortable, and that she had suffered no cold until after entering the car of the defendant at Butte.

The plaintiff's mother, in answer to questions respecting the condition of the car when she and plaintiff and her husband entered it at Butte (through an interpreter, for the reason that she could not speak English), testified: ''After we

got on the train at Butte, Mont., the car was kind of cold, and my daughter a few minutes afterwards she started to cry that her feet were getting cold." This is practically all the mother said about the temperature of the car.

The plaintiff's husband, in substance, testified that as soon as they got on the car he wanted to sleep; that he took off his mackinaw coat and that not long thereafter the young man who was traveling with them—

"started to calling me up; they (the passengers) was leaving the door open to go into the dining car, and the woman (his wife) was hollering it was too cold for her. There was a draft coming into the car. * * * The car was pretty cold. Q. How long did it continue cold—the car that you came down from Butte in? A. It was anyway about eight thirty or nine in the morning, anyway, before we got to Pocatello. Q. Can you tell how it affected you—how cold it made you feel? A. It didn't make me very cold. Of course I was getting up and down, kept on moving, * * * because I was kind of cold, especially when they kept this door open; the draft came right in."

He testified on cross-examination:

"Q. Tell what you did after you got into the car (at Butte). A. I sat down and then started to sleep; that's what I done. Q. Just as soon as you got in the car? A. As soon as the train started."

The witness also said that the passengers, in passing through the car, sometimes would leave the end door open.

"Q. And that is what you thought made the car cold? A. That's what I thought. Q. That is what you attributed the coldness of the car to—people leaving the door open going back and forth; isn't that it? A. Yes, sir. * * * Q. Did you say anything to the conductor at all at any time? A. No; I never told him anything."

Plaintiff's mother, although she could not speak English, said she told the conductor that the "air was cold and to shut the door." Nobody, however, seems to have heard this remark or paid any attention to it. She, however, the same as plaintiff and her husband, seemed to think that the cold they

felt, at least to a large extent, was attributable to the fact that passengers, in passing through the car, left the door open.

The plaintiff also produced evidence showing that the maximum temperature at Butte, Mont., on the 23d day of February, the day she left there, was twenty-seven degrees and the minimum fifteen degrees Fahrenheit, above zero; that the maximum temperature on that day at Dillon, Mont., through which town the train passed on its way from Butte to Salt Lake City, and not very far distant from Butte, was forty-seven degrees and the minimum twenty-four degrees; that at Idaho Falls, another town through which the train passed coming southward, the maximum temperature was thirty-two degrees and the minimum sixteen; that at Blackfoot, Idaho, a town farther south still, the maximum temperature was thirty-nine degrees and the minimum twelve degrees; while at Pocatello, Idaho, the last town in Idaho before passing into Utah, the maximum temperature was thirty-five degrees and the minimum twenty-five degrees. It was also shown that the maximum temperature at Kalispell on the day plaintiff left there was three degrees, while at Great Falls on the day she passed through there the minimum temperature was fourteen degrees below zero.

Plaintiff further testified that her feet were frozen while she was on defendant's train; that she arrived at Salt Lake City on the 23d day of February at about ten thirty or eleven o'clock at night; that her husband attempted to obtain a physician that night, but could obtain none; that a physician called the next morning, but did not make a thorough examination, and he discovered nothing with respect to the condition of her feet, but found that she was suffering from articular rheumatism, and that she could not walk; that he prescribed something for the rheumatism; that subsequently another physician called, and plaintiff went into a more detailed history of her condition, and she then told the physicians that she had frozen her feet; that the two physicians thereafter discovered that the toes on both of her feet were gangrened; that they, from what they had been told by the plaintiff, assumed that the gangrenous condition was caused from having her feet frozen, but both of them ad-

mitted that gangrene might also be produced from other causes, such as wearing tight shoes, or lack of circulation, or pressure on the foot, etc.; that after a time it became necessary to amputate one or two joints from plaintiff's small toes on both feet; that a part of the sole of one foot and a portion of the great toe on one of her feet also "sloughed off." Her finger, which she claimed had been frozen, had fully healed at the time of the trial.

One of the physicians called by plaintiff as a witness also testified that it was physically impossible to freeze anything in a car unless the temperature had receded to thirty-two degrees Fahrenheit; that one in good health, in a dry atmosphere, while exercising, could endure a temperature of from forty to sixty degrees below zero without freezing; that is, under such conditions, could reasonably endure a temperature of from sixty to eighty degrees below the freezing point.

After producing substantially the foregoing evidence plaintiff rested. Defendant's counsel moved for a nonsuit on various grounds, and principally that no negligence on the part of the defendant had been shown; that the plaintiff had not proven the cause of action alleged in her complaint; that she, for various reasons stated, was guilty of negligence as a matter of law; that there was no evidence that the car was in such a condition as would produce the results claimed by plaintiff, etc. The motion was overruled, and defendant now assigns the ruling as error. We shall consider this assignment in connection with the ruling on the motion for a directed verdict.

After the motion for a nonsuit was overruled the defendant proved that the car in which plaintiff was riding at the time in question was an all-steel car of modern pattern and design, and that the heating apparatus therein was also of such pattern and design; that the car had been kept warm at Butte during the whole night preceding the morning in question; that it had been inspected several times during the night, and that the heating apparatus was again inspected in the morning before leaving Butte station, and found in good order and working all right; that the rear brakeman, as was his duty, examined and tested the steam pipes before leaving

Butte, and did so from time to time, as was his duty, between Butte and Pocatello; that in making the tests the steam was working all through the train, including the car in question; that the steam was passing through the train when it arrived at Pocatello, and did so after leaving that town. The other brakeman on the train also testified to passing through the car at different times on the trip between Butte and Pocatello, and that at all of those times the car was comfortably warm; that no one at any time during the trip complained about the car being uncomfortable; that he noticed plaintiff, and particularly her husband, in the car, but did not notice anything wrong except the fact that plaintiff appeared to be unwell; that from the fact that plaintiff could not walk, and that she was wheeled to the car on a wheel chair, and had to be assisted into the car, and from the fact that her husband had spoken to the witness of plaintiff's condition, the witness assumed that plaintiff was paralyzed. The conductor testified that the weather, for the time of the year in the vicinity, was mild at Butte on the morning the train left there; that he noticed plaintiff and her relatives on taking up their tickets a short distance out of Butte; that the car was comfortable; that he passed through the car at least fourteen times at so many stopping places between Butte and Pocatello, and perhaps oftener, and at no time found the car uncomfortable; and that neither the plaintiff nor her mother, nor her husband, nor any one else, at any time, made any complaint whatever respecting the condition of the car, although the husband spoke to the witness about their tickets.

The car was also inspected on arriving at Salt Lake City on the evening in question, and the heating apparatus was found in good order and working all right. It was also shown that the heating plant in the car in question was divided into four separate sections, either one or more of which, or all, could be shut off at any time; that the heating apparatus was so divided for the purpose of regulating the temperature of the car in different kinds of weather; that if all of the sections were operating at the same time the car might become uncomfortably warm in ordinary weather, while in real cold weather all of the sections might be required.

Neither the conductor nor the brakeman seemed to know just how many sections were being used on the trip in question, but it seems not all of the sections were in use. Their attention not having been called to any difficulty respecting the temperature of the car, they, of course, did not make any examination at the time in question. The steam was, however, passing through the sections that were in use at all times tests were made as before stated. Indeed, if the steam had not passed beyond the car in question, then the two cars in the rear of the train would have received no heat. It was also shown that the steam entered the heating pipes in the car in question at a temperature of 212 degrees Fahrenheit.

None of the foregoing evidence was questioned or disputed except to the extent that the statements of plaintiff and her witnesses differed from the statements of defendant's witnesses relative to the temperature of the car. All the statements of defendant's witnesses relating to the several inspections of the car, the testing of the steam passing through the train, etc., were neither disputed nor assailed by any one.

After the foregoing evidence was all in, and both sides had rested, defendant's counsel requested the court to direct a verdict in favor of the defendant. The court denied the request, and submitted the case to the jury on the evidence, and they returned a verdict in favor of the plaintiff, assessing her damages in the sum of $3,500. Judgment was entered on the verdict, and defendant appeals.

A number of errors are assigned and argued, both in counsel's brief and on the oral argument. We shall not attempt to discuss all of the assignments in the order in which they are presented by counsel in the brief, but shall refer to them and dispose of them in our own way.

It is insisted that the court erred in overruling defendant's general demurrer to the complaint. Counsel contend that the complaint was defective, in substance, because it was not alleged "that plaintiff was in normal condition of health." The contention is based upon the proposition that it is the duty of the carrier to provide a reasonable degree of comfort for such passengers only as are in an ordinary and normal state of health. No doubt

1, 2, 3

such is the law.  A carrier is not an insurer in that respect, and is not required to provide for those who may require the attention and care which are usually found in hospitals. While that is the law, yet we cannot conceive why one who is not in ordinary and normal health may not become a passenger.  No doubt, if one in that condition becomes a passenger, he, for that reason, may not demand greater care or comfort as a matter of legal right than one in ordinary or normal condition of health, but he has a right to insist on at least that much.  If, therefore, one desires to undertake a journey on a railroad train when not enjoying ordinary or normal health, he, under counsel's contention, would have no right of action against a carrier, although the latter had failed to provide the comforts it owes to those passengers who are enjoying ordinary or normal health, because the one undertaking the journey under such circumstances could not truthfully allege that he was enjoying ordinary or normal health at the time he entered upon the journey.  It would have been impossible for plaintiff to make such an allegation in her complaint without having recourse to mendacious pleading.  We are of the opinion that, in view that the carrier is required to heat its cars to the extent only that will make them comfortable and sufficiently warm for those enjoying ordinary or normal health, and that the passenger who complains can only require the carrier to do that regardless of such passenger's health, such an allegation is not essential to the right of recovery.  It is quite clear that the passenger need not prove that he was in an ordinary or normal state of health, and if he is not required to prove it he certainly cannot be required to allege it.  While the allegations of plaintiff's complaint are quite general, yet the allegations are sufficient to withstand a general demurrer.

It is next contended the court erred in overruling the motion for nonsuit, and in refusing to direct a verdict, for the reasons that plaintiff had failed to establish negligence on the part of defendant; that she had failed to establish the cause of action alleged in her complaint, and that she had herself shown that she was guilty of negligence barring a recovery.  We shall consider the first two assignments together.

The duty that the law imposes upon common carriers respecting the heating of cars is perhaps as well stated by the annotator in 9 Ann. Cas. p. 557, as anywhere. It is there said:

"It has been uniformly held, in the few jurisdictions in which the question has arisen, that a carrier of passengers is bound to exercise that degree of care, in endeavoring to keep its vehicles sufficiently warm, which a very cautious and prudent person would exercise under the same or similar circumstances, and that if, as a result of the failure to exercise such care, a passenger, who is himself free from negligence, suffers injury from the cold, the carrier will be liable in damages."

In the foregoing statement it is, as a matter of course, implied that the duty is met if the cars are heated so as to make them reasonably comfortable for passengers enjoying ordinary or normal health.

In 3 Michie, Carriers, section 2494, the duty imposed on carriers in this respect is stated thus:

"With regard to properly heating its cars it has been held that a railroad company must exercise that high degree of care which very cautious, prudent, and competent persons would exercise under the same circumstances to keep its cars supplied with such reasonable degree of heat as will keep its passengers, in ordinary normal condition, in a reasonable degree of comfort. To make a carrier liable for injury to a passenger on account of insufficient heating of a coach, it must appear that the condition was negligently permitted to exist, in addition to the fact that a dangerous condition existed; there being no liability unless the carrier has reason to foresee injury to a healthy person by reason of the atmospheric conditions of the car."

In 10 C. J. p. 961, section 1378, the duty imposed on carriers in that regard is stated in the following words:

"A railroad or street railroad company must also provide for the comfort of its passengers by furnishing reasonable means for heating its cars and keeping them warm in cold weather; but, in order to make the carrier liable for injuries due to insufficient heating of the car, it must appear that the condition was negligently permitted to exist, in addition to the fact that a dangerous condition existed, as there is no liability unless the carrier has reason to foresee injury to a healthy person by reason of the atmospheric condition of the car."

So far as the writer has been able to trace the cases, practically all are cited in the footnotes on pages 961 and 962 of 10 C. J., supra.

In support of the text just quoted, *Marcott* v. *Minneapolis, etc., Ry.*, 147 Wis. 216, 133 N. W. 37, is cited. It should be observed that while in that case the complaint was made respecting a sleeping car, yet where the carrier is sued the same rule applies to a sleeping car that applies to all other cars. It is only in case the sleeping car company alone is sued that it is held that, that company not being a common carrier, the same strictness does not apply to it. In addition to the cases cited by counsel, we refer to the Wisconsin case just referred to and the case of *Atlantic Coast Line Rd. Co.* v. *Powell*, 127 Ga. 805, 56 S. E. 1006, 9 L. R. A. (N. S.) 769, 9 Ann. Cas. 553. We shall refer to the Georgia case again hereinafter.

In the Wisconsin case, in the course of the opinion, it is said:

"To sustain liability it is not enough to show that defendant permitted a dangerous condition to exist. It must also be shown that it was negligently permitted to exist. If defendant had no reason to anticipate any injury to any healthy person by reason of the atmospheric condition maintained, it was not negligent."

The plaintiff in that case contended that the car was permitted to be cold, and that for that reason he became seriously ill, etc.

We are of the opinion that, if the defendant in this case permitted the car in question to become so cold as to cause plaintiff's feet to freeze, it failed to exercise that high degree of care and diligence which the law imposes **4** upon it in keeping its cars in a reasonably warm and comfortable condition. No one can doubt that, with the modern heating appliances now in general use, by the exercise of the degree of care required by law, the carrier can maintain its passenger cars in actual use in a reasonably comfortable condition. We are of the opinion that, under the circumstances disclosed by this record, to permit a car to be so cold as to cause a passenger's feet to freeze constitutes negligence as a matter of law. To permit such a degree of cold to exist in a passenger car in actual use cannot be excused except under the most extraordinary circumstances.

The question, however,. still remains whether, under the undisputed evidence and facts and circumstances of this case, a finding was justified that the temperature was so low as to cause plaintiff's feet to freeze. In other words, does the undisputed evidence, direct and circumstantial, justify a finding that plaintiff's feet were frozen while she was a passenger in the car in question between Butte and Salt Lake City? Under both the allegations of the complaint and the instructions of the court, unless the jury found that such was the fact plaintiff cannot recover in this action. The court, in at least three separate instructions, told the jury that unless they found from the preponderance of the evidence that the defendant "negligently failed to heat the car in which plaintiff was riding as a passenger, reasonably sufficient for the comfort of passengers in ordinary health, and by reason thereof the plaintiff's feet were frozen, then you are instructed your verdict must be for the defendant," etc. The jury were thus told that unless they found that the temperature in the car was such as caused plaintiff's feet to freeze she could not recover.

Moreover, during the trial of the case plaintiff's counsel expressly disclaimed recovery for any other injury or cause than the frozen feet and her frozen finger. The court's instruction that the jury must find from a preponderance of the evidence that plaintiff's feet were frozen in the car, therefore, stated the law of this case. In view of that fact, is there any substantial evidence, either direct or inferential, which justifies a finding that the temperature of the car in question, from the time it left Butte until it arrived at Salt Lake City, was such as to cause plaintiff's feet to freeze? In this connection it must be remembered that we cannot escape taking notice of, and being controlled by, the natural laws, nor from the consequences arising from the undisputed facts and circumstances disclosed by the evidence, and if we cannot escape therefrom the jury could not.. What, then, are the undisputed, nay, more, the indisputable, facts and circumstances?

Quite apart from the undisputed evidence respecting the inspection of the heating appliances in the car from time

to time during the trip from Butte to Salt Lake City, and that the same were in good condition and the steam passing through, there are other circumstances from which but one reasonable conclusion is permissible. Is it reasonable to believe that if the temperature of the car in question had fallen so low as to cause the feet of a passenger, in ordinary or normal health, to freeze, that there would have been a single passenger in that car who would not have complained of the cold at once? In this connection, if we keep in mind the fact that the undisputed evidence produced by the plaintiff is to the effect that nothing could have frozen in the car unless the temperature therein had fallen to thirty-two degrees Fahrenheit, how can we explain the fact that none of the other passengers who were in the car discovered the state of the temperature and made no complaint? As before stated, however, we are compelled to take judicial notice of all the natural forces, and in doing so we know, as all men knew, that no one in ordinary or normal health can freeze his feet, when reasonably clad, as plaintiff says she was, unless the temperature falls considerably below thirty-two degrees, which is the freezing point. No doubt a vegetable or water standing still in a vessel will freeze at precisely that point; but we all know that it is impossible to freeze any member of the human body which is properly clothed, and in which there is normal circulation, unless the temperature falls at least considerably below thirty-two degrees. Nor did the physician testify anything to the contrary. All that he was positive about was that nothing could freeze in the car until the temperature had fallen to the freezing point or to thirty-two degrees. Again, if the temperature had at any time fallen to thirty-two degrees no passenger in the car would have remained therein without protesting; and yet no one, it seems, ever discovered the low temperature of the car except the plaintiff, her husband, and her mother. But what of their testimony? Does that disclose such a low temperature? Manifestly not. What does plaintiff say? She says that soon after entering the car "I began to feel cold on my feet and draft getting to them. I felt cold all that time and uncomfortable. I kept telling them (her mother and hus-

band) I was cold.'' What does she say about the heat? Just this: ''No; there was no steam there to amount to anything. I touched it (the pipes); you couldn't hardly feel the heat coming at all.'' According to her statement there was therefore some steam passing through the pipes and also some heat radiating from them. Is it possible to freeze anything so long as there is any degree of heat, however small, radiating from steam pipes? In view of all the evidence, it is, however, clear that the section of the heating plant where plaintiff made the test was in all probability shut off at the time. Does the testimony of the mother add anything to that of the plaintiff? Clearly not. All she says is that the car was ''kind of cold.'' Could not this be truly said of many cars in winter weather? What does plaintiff's husband say? All he says is that ''it (the car) was pretty cold,'' and that the other passengers complained that the ''car was a little cold.'' No other passenger, however, complained to any one. The husband also says that he took off his coat and went to sleep, and that ''it didn't make me feel very cold.'' He, however, thought the cold came through the car door, which was left open by the passengers passing in and out. So did the plaintiff, and her mother did so likewise. Does this evidence authorize a finding that the temperature in the car was at the freezing point? Yet this, in effect, is all the direct evidence that plaintiff produced concerning the temperature of the car. If the temperature did not fall to the freezing point, then, according to the doctor's statements who testified on behalf of the plaintiff, nothing could have frozen in the car; and, if nothing could have frozen therein, plaintiff's feet certainly could not have frozen. If plaintiff had been in the car alone without other passengers, there might be some basis for an inference that the degree of temperature of the car was such as to cause the condition of her feet. When, however, the other indisputable facts are considered, such an inference is not permissible. This is so for the simple reason that, if it be inferred that the temperature was so low as to freeze the feet of one person in ordinary or normal health who is protected by proper clothing, as the plaintiff testified she was, it necessarily follows that the

feet and hands of all others in the same condition and circumstances would have been frozen. If the temperature is low enough to freeze water in one vessel, it is necessarily low enough to freeze that in another similar vessel standing or sitting by the side of the first one. Such is the effect of natural laws, which neither courts nor juries can alter or ignore.

What has been said also explains why plaintiff testified that when she continued to complain of the cold "they wouldn't believe me." Why not? Manifestly because the condition of the car was not such as to justify such a claim. No doubt plaintiff's feet were cold. That, in her condition and state of health, was unavoidable. She had just left a sick bed. Her circulation was greatly disturbed. Her rest had been interfered with. She had been sitting up all the previous night, and was then suffering from indigestion; that is, her stomach was greatly out of order. Under such circumstances her judgment respecting the state of the temperature, as every one knows, was very unreliable. But, it may be asked, is not the evidence conclusive that plaintiff's feet were seriously injured, and that the doctors testified that the condition in which they found them might be attributed to, or may have been the result of, excessive cold and freezing? While all that is true, yet it is also true that the undisputed facts and circumstances, when viewed in the light of natural laws, indisputably show either that the condition of her feet, as the doctors saw it, was not due to freezing, or that they were not frozen during the trip from Butte to Salt Lake City. That either one or the other of these deductions necessarily follows from all the facts and circumstances no one can doubt. If that be so, then, in view of the instructions of the court, and the disclaimer of plaintiff's counsel, to which reference has been made, but one conclusion is permissible. If, therefore, the controlling facts disclosed by the evidence are segregated and detached from the assumptions, surmises, and conjectures, there is no substantial evidence in this record which authorizes a jury to find that plaintiff's feet were frozen while she was a passenger on defendant's train between Butte and Salt Lake City.

In view that the judgment must be reversed, we, under our statute, are required to dispose of the other assignments, one of which is that the plaintiff was guilty of negligence such as will bar a recovery in this action. To intelligently consider that question requires us to determine the duty that the law imposes upon a passenger in case he is required to take passage in a cold car, or where the temperature in the car during the journey is permitted to become so low as to become uncomfortable or dangerous to the health of a passenger who is in ordinary or normal health.

The duty of the passenger under such circumstances is well stated by the Supreme Court of Georgia in *Atlantic Coast Line R. Co.* v. *Powell*, 127 Ga. 805, 56 S. E. 1006, 9 L. R. A. (N. S.) 769, 9 Ann. Cas. 553, where, in a case much like the one at bar, the court said:

"As we have seen, the plaintiff was not chargeable with negligence in remaining upon the car in order that she might complete her journey, but it was her duty to employ such means and avail herself of such resources as were reasonably within her reach while on the car, to avoid the hurtful effects of the prevailing cold."

One of the very first things a passenger should do, in our judgment, is to direct the attention of those in charge of the train to the uncomfortable condition of the car. This is a duty so easily performed that it seems almost incredible that it was not done in this case. Here, as the evidence conclusively shows, the heating apparatus of the car in question was divided into distinct sections. That was done for the express purpose of regulating the temperature of the car to meet the changeable state of the atmosphere on different days as well as in the different seasons of the year. If all of the sections were used at the same time it might easily make the temperature in the car unreasonably warm. If, upon the other hand, a sufficient number of the sections were not used, it might leave the temperature too low; that is, too cold for comfort. The sections are controlled by valves in the car. A mere suggestion to the conductor or brakeman from a passenger who was suffering with cold would, in all probability, have caused them, or one of them, to open the valve and thus permit the steam to enter the heating pipes in the car. It is a

singular fact, worthy of notice, that in almost every reported case where it was claimed that the carrier was remiss in not providing sufficient heat in its cars, the plaintiff in the particular case had repeatedly, and in many cases persistently, complained of the cold condition of the car and had demanded that more heat be provided. In that respect the conduct of plaintiff in this case differs from the conduct of the plaintiffs in all other cases, with the exception of one case, to which plaintiff's counsel have directed our attention. In view of that case they contend that plaintiff was not negligent in failing to call the conductor's or brakeman's attention to the condition of the car in question. The case referred to is *Hastings* v. *Northern Pac. R. Co.* (C. C.) 53 Fed. 224, where this question was directly presented. The jury in that case, after they had retired and for some time had deliberated upon their verdict, returned into court and propounded the following question:

"Are we, the jury, to understand by the instructions of the court that the failure of the plaintiff to call the attention of the railroad employees to the cold condition of the car before taking sick as being contributory negligence to the extent of precluding her from recovering damages in this case?"

In answer to the question the court charged them as follows:

"I mean to tell you this, gentlemen, that if in any instance it was negligence for the plaintiff to keep still, and make no complaint, when she had an opportunity to make complaint, her failure to complain, if she did have an opportunity to do so, would be contributory negligence, which would preclude her from recovering damages. Now, it is for you to say, under all the circumstances of the case, whether, situated as she was, with the opportunities which she had, if any, to give information, if she kept still, and failed to make complaint when she could have made complaint, or ought to have made complaint, taking into account all the circumstances of the case, it was negligence or not; because there may be circumstances under which a passenger would be guilty of no negligence whatever in not com-

plaining to the conductor or the employees of the road, and under other circumstances a failure to complain would be negligence. For instance, if the officers or agents of the road were there, and did not need to be informed, if they knew without being told, that they were neglecting the car, and showed a disposition to disregard the comfort of the passengers, so that a passenger would deem it unnecessary to give the information, for the mere purpose of giving information, it would not be regarded, under those circumstances, as being negligence not to complain. If the car was left in charge of the brakeman, who was not attending to his duty, and the conductor was ignorant of that fact, and the passengers had an opportunity to tell this conductor, and call his attention to it, and asked for relief, but suffered him to remain in ignorance, and made no complaint, then it would be such negligence as would preclude the passenger from any right to complain. Now, I think you will understand that I am leaving the matter in your hands, to decide on the evidence what the facts are, and whether, under these conditions, it was or was not negligence on the part of the plaintiff to not make complaint.''

In that case it is, however, stated in the course of the opinion that the failure to make timely complaint to the trainmen was ''attributable to the inexperience and timidity of the plaintiff and her traveling companions.'' That cannot be said in this case. Here plaintiff's husband was with her, who, if one may judge from his testimony was  8, 9 clearly neither inexperienced nor timid. Moreover, plaintiff was born and reared in this country, and had traveled on trains before. She therefore cannot be excused on the ground stated in the Hastings Case. She was, however, quite ill, and had been so for a considerable time. Moreover, her husband was with her, on whom she certainly had a right to rely, and from what she said during the trial she may have assumed that he had spoken to the conductor. The question of whether a passenger is guilty of contributory negligence by remaining in a cold car, and in not notifying the conductor or making any complaint, is generally one of fact for the jury. While in the case at bar the failure to speak to the con-

ductor or brakeman seems without excuse, yet we are not disposed to hold that in view of plaintiff's condition, and under all the circumstances, she was guilty of such negligence in matter of law as would bar a recovery. That question, therefore, should be submitted to the jury. The court, however, erred in refusing to charge the jury as requested by the defendant upon that question. As already pointed out, the defendant in its answer set forth plaintiff's acts and omissions which it claimed constituted contributory negligence, and among those were plaintiff's failure to notify the conductor, her failure to leave the car or the train, etc. There was ample evidence on all these matters, and the request called attention to' them. The court did not inform the jury respecting plaintiff's duty in those respects, except in the most general terms, but merely instructed them, also in very general terms, respecting contributory negligence. While it may be that, in the absence of a special request, we should not reverse the judgment upon the ground now considered alone, yet where, as here, the court had failed to charge the jury respecting plaintiff's duty, and where the defendant had offered a proper request, the refusal to charge as requested, under all the circumstances of this case, constitutes prejudicial error.

It is also insisted that the court erred in charging the jury in other respects. The court, among other things, charged the jury as follows:

"If you believe from a preponderance of the evidence that the car of defendant in which the plaintiff was riding as a passenger on February 23, 1917, was not heated reasonably sufficient for the comfort of passengers in ordinary health, and by reason thereof the plaintiff's feet were frozen, then you are instructed that the law presumes that such want of heat was by reason of the negligence of the defendant company, and the burden is on the defendant to prove by a preponderance of the evidence that such lack of heat could not be avoided by that high degree of care that the court has instructed you is the duty of the defendant railroad company to use for the safety of its passengers."

Defendant's counsel, with much vigor, contend that the instruction is erroneous for several reasons: (1) Because the

maxim of res ipsa loquitur does not apply in a case like the one at bar; (2) if it be held that it does apply, yet the instruction is erroneous because it shifts the burden of proof; and (3.) because the law does not presume that the defendant is negligent, as stated in the instruction.

For the purposes of this decision we shall assume that the maxim res ipsa loquitur applies to the heating of cars. If, however, that fact be assumed, yet the application of the maxim does not shift the burden of proof under any circumstances, and, so far as we are aware, the courts have uniformly declared to the contrary. In a very recent case *(Williamson* v. *Salt. Lake & O. Ry. Co.,* 52 Utah, 84, 172 Pac. 680) we pointed out that the burden of proof does not shift and cited authority to that effect. In an exhaustive note to the case of *Hughes* v. *Atlantic City, etc., Rd. Co.,* L. R. A. 1916A, commencing at page 930, a very large number of cases are cited, in all of which the doctrine is laid down that the burden of proof does not shift to the defendant. The foregoing case originated in the New Jersey Court of Errors and Appeals, and is reported in 85 N. J. Law, 212, 89 Atl. 769, L. R. A. 1916A, 927. We shall later refer to this case more particularly. It may therefore be confidently asserted that the instruction in question was erroneous in charging the jury that the burden of proof shifted to the defendant.

The proposition respecting the presumption of negligence is argued with much force by counsel for both parties in their respective briefs. Defendant's counsel in effect contend that the maxim of res ipsa loquitur, when applicable, is evidentiary, and merely raises an inference of fact authorizing, but not compelling, a finding of negligence, and that such is its effect in all cases whether the occurrence of the accident is explained by the defendant or not explained. Upon the other hand, counsel for plaintiff insist that, where the maxim applies, all that the plaintiff is required to prove is that he was injured through a derailment of a railroad train on which he was riding as a passenger, or by reason of a collision between two of defendant's trains, and that after making such proof the presumption arises which, if unexplained, compels a finding of negligence. In other words, plaintiff's

counsel contend that, under the circumstances just stated, the court should direct the jury that the defendant was guilty of actionable negligence as a matter of law. It will thus be seen that if the contention of plaintiff's counsel is correct, then the question of burden of proof in most cases is academic merely, while if the defendant's counsel are right the ultimate fact of negligence is for the jury, in view of all the facts and circumstances, whatever those may be. In the recent case referred to, namely, *Williamson* v. *Salt Lake & O. Ry. Co.*, supra, we held to the doctrine contended for by defendant's counsel, following the case of *Sweeney* v. *Erving*, 228 U. S. 240, 33 Sup. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905. Counsel for plaintiff, both in their brief and in the oral argument, criticise the rulings both in the Williamson Case and in the Sweeney Case. They insist that the case of *Chicago, M. & St. P. Ry. Co.* v. *Irving*, 234 Fed. 562, 148 C. C. A. 328, is contrary to the Sweeney Case. If that were admitted, however, in view that the Sweeney Case emanates from the Supreme Court of the United States, the court of last resort, and the Irving Case, just referred to, emanates from the Court of Appeals, the Sweeney Case would control; but an examination of the Irving Case will disclose that that case follows, and does not contradict, the Sweeney Case. It is there said, quoting from one of the decisions of the Supreme Court with respect to the doctrine of res ipsa loquitur :

"* * * When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

What is there in this quotation which is contrary to the Sweeney Case? If it affords merely reasonable evidence that simply amounts to an inference of fact that negligence existed. In other words, from the occurrence the jury may infer the ultimate fact of negligence. That is all that is decided in the Williamson Case. That is all that is contended for in the Sweeney Case.

Counsel, in effect, contend that the court must direct a verdict as matter of law in case no explanation is made. Counsel, however, also insist that the holding in the Williamson Case is contrary to former holdings of this court. With due respect for counsel's opinion, we, nevertheless, are of a contrary opinion. So far as the writer is aware, this court has considered the probative or evidentiary effect of the maxim of res ipsa loquitur in two, and in only two, cases, namely, *Christensen* v. *Railroad*, 35 Utah, 137, 99 Pac. 676, 20 L. R. A. (N. S.) 255, 18 Ann. Cas. 1159, and *Furkovich* v. *Bingham Coal & Lumber Co.*, 45 Utah, 89, 143 Pac. 121, L. R. A. 1915B, 426. In both of those cases we clearly indicate that the effect of the maxim is evidentiary, and that where it applies negligence, which is the ultimate fact to be established, may be inferred from a particular occurrence or accident. In the Christensen Case we followed the rule laid down by the Court of Appeals of New York in the case of *Griffen* v. *Manice*, 166 N. Y. 188, 59 N. E. 925, 52 L. R. A. 922, 82 Am. St. Rep. 630. In view of counsel's vigorous insistence that the doctrine laid down in the Williamson Case is unsound, we have taken special pains to again examine into the subject. No one, even though he has examined the decisions upon the subject merely cursorily, can, we think, arrive at any other conclusion than that the decisions are utterly irreconcilable. Moreover, it is just as apparent to any one who is at all conversant with the subject that most any one can find something to criticise in at least most of the decisions. Under such circumstances, the only reasonable, the only logical, course to pursue is to keep in mind fundamental principles when called upon to decide between the conflicting opinions. It is fundamental that negligence is neither inferred nor presumed merely because a passenger was injured. Nor is negligence presumed as a matter of law. In that regard negligence which constitutes a wrong, like fraud, must be established. It may, however, always be inferred from other facts and particularly in cases between carrier and passenger, where a collision or derailment has occurred. It may be inferred from such occurrence, and where no explanation is offered in such a case the inference may be so strong as not only to

justify, but to compel, a finding of negligence, which is the ultimate fact to be established. The circumstances surrounding the happenings of an accident, even on a railroad, may, however, easily be such that, while they may justify a finding of negligence, yet may not compel such a finding. In that regard there is no difference in principle between a case where the maxim of res ipsa loquitur applies and where it does not; that is, an inference may arise from one or from a series of facts in any kind of a case which, if unexplained, may not only justify, but may also require, a finding of the ultimate fact of negligence. The only difference between an ordinary case and a case between carrier and passenger consists in the quantum of proof the plaintiff must adduce in order to make a prima facie case. True, courts in applying the maxim of res ipsa loquitur very frequently speak of the presumption which arises, etc. By reading the decision it, however, becomes clear that at least most writers refer to the presumption so called merely as an inference of fact, and not as a presumption requiring the court to direct a verdict, even though no explanation is offered. That such is the effect is, we think, clear from the best-reasoned cases. In *Benedick* v. *Potts,* 88 Md. 52, 40 Atl. 1067, 41 L. R. A. 478, the maxim and its effect is very learnedly discussed by Mr. Chief Justice McSherry. In the course of the opinion he says:

"In no instance can the bare fact that an injury has happened, of itself divorced from all the surrounding circumstances, justify the inference that the injury was caused by negligence. It is true that direct proof of negligence is not necessary. Like any other fact, negligence may be established by the proof of circumstances from which, its existence may be inferred. But this inference must, after all, be a legitimate inference, and not a mere speculation or conjecture. There must be a logical relation and connection between the circumstances proved and the conclusion sought to be adduced from them. This principle is never departed from, and, in the very nature of things, it never can be disregarded. There are instances in which the circumstances surrounding an occurrence and giving a character to it are held, if unexplained, to indicate the antecedent or coincident existence of negligence as the efficient cause of an injury complained of. These are the instances where the doctrine of res ipsa loquitur is applied. This phrase, which, literally translated, means that 'the thing speaks for itself,' is merely a short way of saying that the circumstances attendant

upon an accident are themselves of such a character as to justify a jury in inferring negligence as the cause of that accident.''

Mr. Justice Cullen in *Griffen* v. *Manice*, supra, approves the language of Mr. Chief Justice McSherry, and in referring to the maxim says:

"This is the principle which underlies the maxim of res ipsa loquitur. When the facts and circumstances from which the jury is asked to infer negligence are those immediately attendant on the occurrence, we speak of it as a case of res ipsa loquitur; when not immediately connected with the occurrence, then it is an ordinary case of circumstantial evidence."

The only other case we shall quote from is the case of *Hughes* v. *Atlantic City, etc., R. R. Co.*, 85 N. J. Law, 212, 89 Atl. 769, L. R. A. 1916A, 927. In view that the opinion in that case so clearly states our views upon this question and in view that it is in strict harmony with the rule laid down in the Sweeney and the Williamson Cases, we shall take the liberty of quoting at length from the opinion. Mr. Justice Swayze, in discussing the charge of the court, which was very similar to the charge in the case at bar, said:

"The effect of this charge was to relieve the plaintiff from the duty to satisfy the jury by the preponderance of the evidence that the defendant had been negligent, and to deprive the defendant of his right, which we have said is a substantial one, to have the plaintiff bear the burden of the affirmative. *Bien* v. *Unger*, 35 Vroom (64 N. J. Law) 596 (46 Atl. 593); *McGilvery* v. *Electric Light & Power Co.*, 34 Vroom (63 N. J. Law) 591 (44 Atl. 637). The learned trial judge distinctly said that this burden shifted to the defendant, and he did not even submit to the jury the question whether the plaintiff had established negligence. He treated that as a matter of legal inference, and only left to the jury to say whether the defendant had exculpated itself. He thus put upon the defendant, in a case where there was no direct evidence of negligence, a burden from which it would have been free in a case where there was direct evidence. Instead of the question that has been so much discussed in the cases, whether negligence may be inferred from the mere fact of injury, we now have the proposition that the inference of negligence is so strong that the jury need not consider it at all, but need only consider whether the defendant has exculpated himself. This is an unwarranted extension of the application of the maxim res ipsa loquitur. The importance of the rule which finds expression in that maxim is found in the province of the trial

judge, and not in the province of the jury. He is called on in the first instance to say whether there is any evidence of negligence to go to the jury; in the absence of direct evidence, he may, in cases where the maxim applies, hold that the circumstances are such as will, unexplained, permit the jury to draw the inference of negligence; but that inference is still one for the jury, and not for the court. They may not believe the witnesses; the circumstances may be such that the jury will attribute the injury to some cause with which the defendant has nothing to do; they may find the inference of negligence too weak to persuade their minds; they may think a reasonably prudent man would have been unable to take precautions to avoid the injury; and, in any event, they may render a verdict for the defendant. This is within their province, even when there is no explanation by the defendant. When there is such explanation, it is for the jury to decide, just as in the ordinary case of whatever kind, what the actual facts are, and what inference should be drawn therefrom. The most that is required of the defendant is explanation, not exculpation; and that explanation may leave the mind in equipoise, in which case the defendant would be entitled to a verdict, because the plaintiff has failed to prove his case by the weight of the evidence.

"The question discussed in the cases that involve the application of the maxim res ipsa loquitur has always been whether mere proof of the injury justified a jury in drawing an inference of negligence, so that a nonsuit would be improper, or, in other words, whether it sufficed to prevent a nonsuit. Negligence in such a case may be a permissible inference, but is not a necessary one, as the judge's charge treated it. In the first case in which the maxim was discussed in this state, Chief Justice Beasley, who dissented because he thought the plaintiff had made out a case, said that the facts as proved would have legally warranted a verdict against the defendants; but he did not suggest that in the absence of explanation such a verdict would have been required, and the court would have been justified in directing a verdict for the plaintiff. The reason, of course, is that negligence in such a case is only a matter of inference, and under our system is for the jury.

"The rule has been stated with great accuracy by Mr. Justice Dixon, speaking for this court, in an action by a passenger against a carrier. He says: 'The rule supported by authority is that when a passenger shows that he was injured through some defect in the appliances of the carrier, or through some act or omission of the carrier's servant, which might have been prevented by due care, then the jury have the right to infer negligence, unless the carrier proves that due care was exercised.' *Whalen* v. *Consolidated Traction Co.*, 32 Vroom (61 N. J. Law) 606 (40 Atl. 645, 41 L. R. A. 836, 68 Am. St. Rep. 723). In *Mumma* v. *Easton & Amboy Railroad Co.*, 44 Id. (73 N. J. Law) 653 (65 Atl. 208), we again said that the meaning of the maxim res ipsa loquitur was that 'the occurrence itself, in the absence of explanation

by the defendant, affords prima facie evidence that there was want of
due care.' It is evidence. Whether it amounts to proof is for the jury
to say, even in the absence of explanation by the defendant. A very
good statement of the law, in a case much like the present, is to be
found in *White* v. *Boston & Albany Railroad*, 144 Mass. 404 (11 N. E.
552). The court said: 'If the shade was defective and unsafe, the
question whether it was in that condition through the negligence of the
defendant would be for the jury; and the fact that it broke and fell
from the use for which it was intended would be evidence that it was
defective and unsafe, and, if not explained or controlled, would be suffi-
cient evidence to authorize the jury to find that the defendant was
negligent in regard to it.' This is a full recognition of the ordinary
rule that inferences from the facts of the case are for the jury. The
result we reach is also sustained by a recent opinion of Mr. Justice
Pitney in the United States Supreme Court. *Sweeney* v. *Erving*, 228
U. S. 233 (33 Sup. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905).

"The inference of negligence from the mere happening of the acci-
dent may be a legal inference in the sense that it is permitted by the
law, but it is not a legal inference in the sense that it is required. It
is true that in some cases language may be found to the effect that
under certain circumstances the burden of proof shifts, while other
cases declare quite as explicitly that the burden of proof never shifts."

In our judgment the law is correctly reflected in the fore-
going cases, and hence we adhere to the rule laid down in the
Williamson Case.

Finally, it is contended that the district court erred in
charging the jury as follows:

"You are therefore instructed that it was the duty of the
defendant to care for the safety of the plaintiff as such pas-
senger, and in doing so was bound to exercise the highest de-
gree of care, prudence, and foresight consistent with the
practical operation of its road, or, in other words, the utmost
skill, diligence, and care consistent with the business, in view
of the instrumentalities employed, and the danger naturally
to be apprehended, and a failure to exercise such care would
constitute negligence on the part of the defendant."

Counsel for defendant contend that the charge imposed a
greater burden upon their client than is authorized by law.
The degree of care that the law requires a carrier to exercise
to protect its passenger in railroad accident cases is stated in
10 C. J. p. 856, section 1296, in the following words:

"In a great majority of the cases it is stated that the carrier, particularly in case of a railroad company, must exercise the utmost care and diligence, or the highest degree of care, prudence, and foresight, for the passenger's safety."

Various forms of expression are there given, and the cases from the different juris'dictions in which expressions such as we have copied above occur, including Utah, are there collated. At page 858, section 1297, same volume, it is, however explained what is meant by the term utmost care and diligence, etc. It is there pointed out that the phrase cannot be so applied as to amount to an absolute guaranty or insurance of the passenger's safety. Every lawyer, as a matter of course, understands that; but the layman, unless that term is explained would be very apt to understand the phrase of utmost care and diligence to mean just what it implies, namely, as a guaranty of the passenger's safety. The question raised by this assignment is, however, not what is meant by the phrase, but the contention, in effect, is that although it be conceded that ordinarily the degree of care as stated in the foregoing quotation must be exercised by the carrier, yet that the law does not impose such a degree of care and diligence in cases like the one at bar. It seems the contention is well founded. We have carefully examined all of the cases where the question respecting lack of heat, etc., in passenger cars was involved, and in none of them was the degree of care and diligence required that is stated in the instruction here complained of. We have hereinbefore stated the care and diligence that is imposed on the carrier by the decisions in cases like the one at bar. True, as counsel for plaintiff suggest, this court has stated the degree of care and diligence required of the carrier in ordinary accident cases to be as it is stated in 10 C. J., supra. When we come to examine into the cases, however, we find that while in a great majority of the jurisdictions, including Utah, the degree of care is as stated in 10 C. J., supra, yet in those same jurisdictions, when the question here presented has arisen, the degree of care required of the carrier was such only as we have hereinbefore stated it to be. If reference be had to 10 C. J. p. 856 et seq., where the general rule respecting the degree of care and dili-

gence that must be exercised by the carrier in ordinary cases
is stated, and in connection therewith examine the list of cases
supporting the text in 10 C. J., and in doing so reference is
made to 10 C. J. p. 961, to which we have before referred, it
will be found that cases from the same jurisdiction require a
different degree of care in cases like the one at bar than is
required in ordinary accident cases. In the latter class of
cases only that degree of care and diligence is required which
we stated in that portion of this opinion where we referred
to the duty the law imposes on carriers in cases of this kind.
The cases in which the general rule respecting the degree of
care and diligence that is required in ordinary railroad acci-
dents, therefore, are not of controlling influence in a case of
this kind, where a different degree of care is required by the
decisions. The decisions, therefore, that prescribe the degree
of care that must be exercised to protect the passengers in
cases like the one at bar must control, and, if they do, then
the instruction complained of is erroneous for the reason that
it imposed a higher degree of care and diligence than the law
requires in such cases. One need reflect but a moment to dis-
cover that there is a valid reason for the difference between
the two classes of cases. In an ordinary railroad case the
passenger generally has no means of escape, nor could he, in
most cases, avert or escape the injury if he suffers one. In
cases of this kind as we have pointed out, however, and as is
clear from the cases, the passenger may ordinarily not only
avoid serious consequences but it becomes his duty to do so
where the opportunity is presented. In this class of cases he
usually has ample time and opportunity not only to have the
matter complained of remedied by notifying those in charge of
the train, but he may also often escape the consequences by
going into another car, or, if necessary, by leaving the train
if that can be done without great inconvenience to him. There
is therefore no necessity for a higher degree of care and dili-
gence in this class of cases than the one before stated. The
rule in this class of cases is therefore based on both equity
and utility, which constitute the basis of all just laws. The
instruction last referred to is therefore also erroneous.

From what has been said it follows that the judgment should be, and it accordingly is, reversed, and the cause is remanded to the district court with directions to grant a new trial. Appellant to recover costs.

McCARTY, J., concurred in the result.

CORFMAN, THURMAN, and GIDEON, JJ., concurred.