RODDY MFG. CO. v. DAN COX.

Eastern Section. December 3, 1927.

Petition for Certiorari denied by Supreme Court, February 28, 1928.

E. F. Smith, of Morristown, and Ralph Cate, of Knoxville, for plaintiff in error.

John R. King, of Morristown, for defendant in error.

THOMPSON, J. The plaintiff, Dan Cox, brought this suit before a Justice of the Peace against the defendant, Roddy Manufacturing Company, to recover damages for sickness suffered by him as a result of drinking a portion of the contents of a bottle of Coca-Cola containing the body of a dead mouse—which bottle of Coca-Cola had been bottled by defendant and sold to the proprietor of a cafe or soft drink stand from whom plaintiff bought it.

The Justice of the Peace rendered a judgment in favor of the defendant, from which the plaintiff appealed to the circuit court where the case was tried by the Circuit Judge without the intervention of a jury. In the circuit court judgment was rendered in favor of the plaintiff for $150, and costs. The defendant has filed the record for writ of error and has assigned errors, one of which is that there was no material evidence to support the judgment of the circuit court.

The plaintiff was the janitor of a bank at Morristown. Paul Good operated a cafe or soft drink stand near the Southern Railway depot in Morristown. The defendant operated a bottling plant at Morristown and bottled Coca-Cola and other soft drinks such as soda waters of various flavors. The exact location of defendant's plant was not shown.

On an afternoon in March, 1926, the plaintiff was sent to the plant of a cold storage company a few blocks distant from the cafe or soft drink stand of Paul Good—or at any rate he had occasion to go to said cold storage plant, and in going there he evidently had to pass the said cafe or soft drink stand. He went in and called for a bottle of Coca-Cola, but Good told him that he (Good) had no Coca-Cola at that time but would have some in a few minutes as he had ordered a case from the defendant bottling company. Plaintiff proceeded on his way to the cold storage plant and then returned to the said cafe or soft drink stand and again called for a bottle of Coca-Cola. Only about ten or fifteen minutes had elapsed since the plaintiff's first call for Coca-Cola but during that time a case had been delivered to Good by the defendant company.

When plaintiff called for the Coca-Cola on the second occasion he was standing or sitting at the counter near the center of the cafe or stand, and Good was across the counter from him. Good stooped and picked up a bottle from the case which he had just received from the defendant, pulled the top or cap off it and handed it to plaintiff. Plaintiff, without examining the bottle, began to drink from it and swallowed a portion of its contents. Upon feeling a solid sub-

stance go down his throat he examined the bottle and discovered that it had a dead mouse in it. He immediately called Good's attention to it and showed it to him.

It should have been stated that as Good handed plaintiff the bottle, plaintiff handed Good a nickel. Good turned to put the nickel in the cash register as plaintiff began to drink from the bottle, and Good was putting the nickel in the cash register when plaintiff called out to him that there was a dead mouse in the bottle. So it appears that only a second or two passed from the time Good handed plaintiff the bottle until plaintiff called Good's attention to the fact that there was a mouse in it, and plaintiff had no time in which to substitute bottles or in which to tamper with the bottle in any way. Moreover, it is undisputed that the mouse was so large that it could not be gotten out of the bottle.

Good testified positively that he took the bottle out of the case of Coca-Cola which he had received from the defendant only a few minutes before; that it was the first one which he took from the case; and that said bottle had a Coca-Cola top or cap on it. However, the bottle itself was not a bottle ordinarily used for bottling Coca-Cola, although it was of the same size, general shape and appearance. The bottles used for Coca-Cola had the word "Coca-Cola" blown into them—that is, blown into the glass itself—and they were of a little different design from the bottles used for the various flavored soda waters which defendant bottled. The bottle from which plaintiff drank was of the latter kind, although, as stated, it was taken from the case of Coca-Cola which Good had just received from defendant; it had a Coca-Cola cap (with the word "Coca-Cola" printed thereon) on it; and it in fact contained Coca-Cola.

After drinking from the bottle and discovering the dead mouse plaintiff became nauseated and vomited. He then took the bottle, still containing the dead mouse and the unconsumed portion of the Coca-Cola, to the office of his attorney, Mr. J. R. King, of Morristown. Then he went back to the cafe or soft drink stand where he met Mr. Paxton, the manager of the defendant company. It seems that Good had called Mr. Paxton over the telephone while plaintiff was at Mr. King's office. Mr. Paxton and plaintiff went together to Mr. King's office where some talk was had of a settlement. Mr. Paxton and plaintiff then went to the defendant's plant. Paxton carried the bottle containing the mouse, etc., with him and when they reached defendant's plant he broke the bottle in the presence of the plaintiff. No settlement was agreed upon—although plaintiff testified that Paxton led him to believe that a settlement would be made later—and plaintiff then went to a physician who washed out his stomach and gave him some medicine.

It appears, as stated, that defendant bottles other soft drinks as well as Coca-Cola, but that in bottling these other soft drinks it

uses a different bottle and cap. This, because of the fact that defendant's contract with the Coca-Cola Company, from whom defendant buys its Coca-Cola syrup, requires it to use the distinctive type of bottle and cap above mentioned in bottling Coca-Cola, and prohibits it from using said distinctive type bottle and cap in bottling the various soda waters. So, the first operation in the bottling process is to separate or assort the bottles so that no Coca-Cola will be bottled in soda water bottles and no soda water will be bottled in Coca-Cola bottles, etc.

Since defendant uses the same machinery in all of its bottling it only bottles one kind of drink at a time. And when defendant desires to bottle Coca-Cola it first assorts the bottles and puts into the machinery only Coca-Cola bottles. It puts only Coca-Cola caps into the capper; and only Coca-Cola syrup into the syruper. But, as stated, the bottles, whether for Coca-Cola or soda waters, are all of the same size, general shape and appearance, and any of the caps fit any of the bottles.

The operation is automatic and continuous and is as follows: The bottles are put into the machinery which dips them into a three per cent solution of caustic soda 140 degrees hot; they are then carried by the machinery through brushers which brush them both inside and out; they are then set by the machinery under the syruper which pours the proper amount of syrup into them, they are then passed by the machinery to the device which pours the carbonated water into them and puts the caps on them. The man or men operating the machinery then hold them before a powerful electric light and look through them to see that they do not contain any foreign substance, and then put them into the cases. They remain in these cases in the plant a maximum of three days before being hauled and delivered to the customers, but the last inspection is the one in front of the electric light as the bottles leave the capper and just before they are put into the cases. However, it should have been stated that there is a short interval of time as the empty bottles leave the washing part of the machinery and go to the syruper in which they pass under the observation of the operator and in which he inspects them to see that they are empty and clean. It should also have been stated that the syruper has a strainer on it which prevents any solid substance that might be in the syrup from passing into the bottles. It should also have been stated that the bottles used and put into the machinery are mostly dirty ones which have previously contained soft drinks but have been returned empty to the defendant by its customers.

It is undisputed that the defendant's machinery is of the most modern and approved type, and that its plant is clean and sanitary.

The foregoing statement as to the method and process of bottling, etc., was taken from the testimony of Mr. Paxton, the defendant's

manager who testified in its behalf. But his testimony shows that there were two other men who worked in the defendant's plant and operated the machinery more than he did, and neither of these men testified.

There are only two other facts or circumstances which we think tend to shed light on the case. They are: first, that within an hour or two after plaintiff drank from the bottle containing the dead mouse, and while he was at the defendant's plant with Mr. Paxton, he drank a bottle of Coca-Cola; and, second, the trial judge permitted several persons who bought Coca-Cola from the defendant to testify that during the last five or six years they had discovered dead mice in bottles of Coca-Cola which they had gotten from the defendant and which the defendant had bottled. In overruling the defendant's objection to this evidence the court said:

"Things of that sort—if it is shown from time to time that these mice were found, it would be evidence of negligence."

It seems to us that the foregoing statement of facts makes out a case in which the trial judge was warranted in rendering a judgment in favor of the plaintiff.

The Coca-Cola which plaintiff bought and which contained the dead mouse had been bottled by the defendant not more than three days before, and it had been in defendant's possession until just a few minutes before Good opened it and handed it to plaintiff to drink. While it is within the realm of possibility that some malicious person may have put the mouse in the bottle while it was in defendant's possession or during the short interval of time between its delivery by defendant to Good and Good's sale of it to plaintiff, yet this is so highly improbable that we think the court was fully justified in disregarding it. We think the court was fully justified in reaching the conclusion that the dead mouse was in the bottle when it was put into the machine, that the machine did not remove it and that the defendant's employees were negligent in not discovering it on the two occasions or opportunities which they had of inspecting the bottle. In fact, this is the only conclusion that can be reached from the evidence, unless it is concluded that plaintiff or Good or both of them testified falsely. And there is nothing in the record which tends to discredit their testimony.

It is true that it does seem unlikely that a man who had drunk from a bottle of Coca-Cola containing a dead mouse would, within an hour or two thereafter, drink another bottle of the same drink bottled at the same plant, but this fact alone would not justify us in concluding that the plaintiff's claim was a fake. And the fact that the bottle itself was not the kind ordinarily used for bottling Coca-Cola tends to show a failure of inspection equally as much if not more than it tends to render the plaintiff's story improbable.

152

Insofar as the evidence of the defendant is concerned, while Mr. Paxton testified that the two employees of defendant who operated the machinery inspected the bottles as set out above, yet he was not present at the plant a great deal of the time and could not have known that they always performed their duty, and the said two employees did not testify.

It is true that under the decisions of the Supreme Court the defendant did not warrant to the plaintiff that the bottle contained no injurious substance, yet the Supreme Court has said:

"In the present case, the mouse may have gotten into the bottle by some unavoidable accident, but proper inspection should have disclosed the fact, and if in the light of the finding by the jury it were fairly inferable that the mouse was bottled up at the Bottling Company plant, we would consider it our duty to reverse the case, because of the high duty resting on the defendant. But the jury was told to inquire whether the mouse was in the bottle when it left the hands of this company, and, if so, whether its presence there was due to the negligence of the company. The court suggested to the jury the theory of the defendant that there was opportunity for malevolent persons to open this bottle and put the mouse into it before or after it left the factory, and they should use their common sense as men in deciding the issue. In view of the extraordinary care shown to exist at the bottling plant and the verdict of the jury, it may be that this thing occurred without the fault of the defendant. There are sufficient inferences that may be drawn from the facts to sustain the finding (of the jury in favor of the defendant)." Words in parenthesis ours. Crigger v. Coca-Cola Co., 132 Tenn., 545, 179 S. W., 155; Boyd v. Coca-Cola Co., 132 Tenn., 23, 177 S. W., 80.

In the case at bar it seems to us that the trial court was amply justified in finding that the defendant was negligent. We are further of the opinion that he could not have found otherwise under the facts proven, and that this would have been true had the alleged incompetent evidence not been offered. Therefore, under Hinton v. Insurance Co., 110 Tenn., 113, 72 S. W., 118, it is our duty to affirm the judgment regardless of whether the evidence objected to was competent or incompetent.

An order will be entered affirming the judgment of the lower court, with costs.

Portrum and Snodgrass, JJ., concur.