## HOBACK v. COCA COLA BOTTLING WORKS OF NASHVILLE.
### —98 S. W. (2d), 113.

Middle Section.   February 21, 1936.

Petition for Certiorari denied by Supreme Court, November 21, 1936.

Hardin H. Conn, of Springfield, for plaintiff in error.
Trabue, Hume & Armistead, of Nashville, for defendant in error.

FAW, P. J.   This is an appeal in the nature of a writ of error by J. R. Hoback, the plaintiff below, from a judgment of the circuit court of Robertson county dismissing his suit.

Plaintiff sued the defendant Coca Cola Bottling Works of Nashville, a Tennessee corporation, for $5,000 as damages for personal injuries suffered by him, averring in the first count of his declaration that defendant negligently mixed and prepared a Coca Cola beverage in one of its bottles in which there was a dirt dauber's nest, larvae, worms, spiders, and bugs; that defendant negligently filled and sealed said bottle containing said dirt dauber's nest, etc., and delivered same, along with other bottles of drinks and beverages, to J. W. Martin's store in Robertson county, Tenn.,

for sale to its customers and for human consumption; that, on April 9, 1934, plaintiff purchased said bottle from J. W. Martin at his said store, and there and then drank the contents of said bottle without knowing of the presence therein of said dirt dauber's nest, etc.; that, as a result of drinking the contents of said bottle, which had been contaminated, poisoned, and rendered unfit for human consumption, by reason of the presence therein of said dirt dauber's nest, larvae, worms, spiders and bugs, plaintiff became nauseated and sick, and suffered great physical pain, mental anguish, shock, and fright, and was disabled and confined to his bed, under the care and treatment of a physician, for a long time thereafter, and was totally disabled and incapacitated for work, and was seriously and permanently injured.

The foregoing is a mere synopsis of the first count of plaintiff's declaration, which contains, in much detail, all essential averments to state a cause of action against the defendant upon the theory that plaintiff's injuries were proximately caused by negligence of the defendant.

Through the second count of his declaration plaintiff sought to predicate his cause of action upon an alleged breach of a warranty by the defendant that said bottle of Coca Cola was pure, wholesome, harmless, and fit for human consumption.

The defendant pleaded the general issue—not guilty—and a jury was impaneled and evidence on behalf of both parties, respectively, was heard. A motion for peremptory instructions, made on behalf of the defendant, was overruled at the close of plaintiff's evidence in chief, but the motion was renewed at the close of all the evidence and was then sustained, and the trial judge directed the jury to return a verdict for the defendant, which was done, and plaintiff's suit was dismissed at his cost.

A motion for a new trial on behalf of plaintiff was overruled, to which action of the court plaintiff excepted and prayed an appeal in error to this court, which appeal was granted by the court and perfected by the plaintiff.

The defendant's motion for peremptory instructions was "upon the ground that there is no evidence upon which a verdict against it can be based."

In this court, the plaintiff's assignments of error are five in number, but all of them are (in different forms, with full specifications of asserted errors and citations to the record) directed to the proposition that the trial court erred in directing a verdict for the defendant.

It is insisted for plaintiff that there was material evidence which required the submission of the case to the jury upon either or both of the counts of the declaration.

Plaintiff seeks to predicate the alleged breach of warranty

in the second count of his declaration upon section 7208 of the Code of 1932, which is a codification of section 15 of chapter 118 of the Public Acts of 1919 (the Uniform Sales Act), as amended by section 7 of chapter 93 of the Public Acts of 1923.

Section 7208 of the Code reads as follows:

"7208. *Implied Warranties of Quality.*—Subject to the provisions of this article and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.

"(5) An implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usage of trade.

"(6) An express warranty or condition does not negative a warranty or condition implied under this article, unless inconsistent therewith. (1919, ch. 118, sec. 15; 1923, ch. 93, sec. 7.)"

In the case of Crigger v. Coca-Cola Bottling Co., 132 Tenn., 545, 179 S. W., 155, 157, L. R. A., 1916B, 877, Ann. Cas., 1917B, 572, which was a case on all-fours with the instant case, it was ruled that there was no warranty of the quality of the Coca Cola, and that "there is no logical basis of liability for personal injury without some negligent act or omission."

The learned and able counsel for plaintiff, in order to avoid the effect of the ruling in the Crigger Case, supra, points out the fact that the Crigger Case was decided in 1915, which was prior to the passage of the Uniform Sales Act of 1919.

But in seven reported "coca cola cases" since the passage of the Uniform Sales Act, beginning with Coca Cola Bottling Works v. Selvidge (January 29, 1927) 4 Tenn. App., 558, and ending with Merriman v. Coca Cola Bottling Co. (July 29, 1933), 17 Tenn. App., 433, 68 S. W. (2d), 149, in all of which cases certiorari was denied

by the Supreme Court, it was held that, to sustain a recovery in such a case, there must be evidence of negligence which was a proximate cause of the injury.

It is true that, so far as we have discovered, a recovery was sought in but one of the above-mentioned seven cases upon a claimed breach of warranty. In Yates v. Coca Cola Bottling Works, 14 Tenn. App., 7, 10, such claim was made and rejected, the court saying: "The proposition of implied warranty under the Uniform Sales Act does not strengthen the plaintiff's case."

However, section 7 of the Uniform Sales Act, and section 7208 of the Code, are merely declaratory of the pre-existing law of this state. This was the view entertained by the learned trial judge, and in this we concur. It follows that plaintiff was not entitled to have the case submitted to the jury upon the second count of his declaration.

Was there evidence to take the case to the jury upon the first count of plaintiff's declaration, based on alleged negligence of the defendant in filling and distributing the bottle in question?

The plaintiff, J. R. Hoback, about 50 years of age, is a farmer and blacksmith living in the Tenth civil district of Robertson county, and in the general neighborhood of a country store operated by J. W. Martin. Mr. Martin carries in his store a general stock of merchandise, and also keeps for sale Coca Cola and other soft drinks which he buys from the defendant.

On the morning of April 9, 1934, plaintiff worked at the blacksmith shop of Lon Keith until about 11 o'clock, when he went to Martin's store and reached there just as Martin was going to his dinner in a house or room adjoining the store. Plaintiff says that Martin locked the doors to the store, and that he (plaintiff) sat on the front porch while Martin was eating his dinner.

J. W. Martin testified (as plaintiff's witness) that when he went to dinner on that occasion he left the front door of the store open; that plaintiff "was sitting up towards the front on the counter," and Marvin Martin, about twenty-two years of age (the mentally incompetent son of J. W. Martin), was in the store with plaintiff when he (J. W. Martin) came back from his dinner.

After Mr. Martin returned to the store, plaintiff bought and received a dime's worth of cheese and then told Martin he wanted a bottle of Coca Cola.

Martin's custom was to place cases of Coca Cola, when he received them from defendant's truck, behind the counter in his main store (which was about 18 feet wide and 30 feet long, with a counter on each side and an aisle between), and as he "needed it" he took bottles out of cases under the counter and put them in the icebox, which was in the aisle between the counters.

When plaintiff asked for a bottle of Coca Cola, as before stated,

Martin (according to his testimony) went to the icebox in the aisle near the rear of the store, took out a bottle of Coca Cola, took the cap off the bottle (with a device designed for that purpose), gave the bottle "a little look," saw nothing wrong with it, handed it to plaintiff, and then returned to the front of the room and began waiting on another customer.

Plaintiff testified that Martin got the bottle of Coca Cola from under the counter; that he (Martin) was "painting his icebox that day" and had no ice, and the Coca Cola was not cold; that Martin uncapped the bottle and brought it to him (plaintiff) in the back of the store and then went to the front of the room; that he turned the bottle up and drank about two-thirds of its contents, when something went in his mouth and he "spit it out" and looked in the bottle, and there were "settlings" down in the bottom of it that looked like bugs and spiders and worms; and that he then called Mr. Martin back there and showed the bottle to him.

J. W. Martin testified that his icebox was not being painted on the day that plaintiff bought the bottle in question; that it had not been painted "right lately," as he painted it when he first bought it.

Martin stated further that very soon after he handed the bottle of Coca Cola to plaintiff he heard plaintiff call him and he went back to plaintiff, and plaintiff said, "Look at this bottle and see what is in there;" that witness took the bottle and went to the window and "turned it down" and saw that "it looked a little milky color" and "didn't look natural;" that it "sort of boiled up like, was boiling, blubbering, working like," and he saw in the bottle a spider or a "fly head" or some sort of bug that he took to be a roach.

Martin suggested to plaintiff that he would show the bottle to the "Coca Cola man when he comes," but plaintiff said that he wanted the bottle and he paid Martin for the bottle and took it away with him. However, some other persons at Martin's store on that occasion saw the bottle, and one of them, Herschel Stewart, testified at the trial that the contents of the bottle looked "milky" and "it looked like there were two or three spiders and a roach" in it.

On his way home from Martin's store plaintiff became violently ill and he was confined to his bed for about nine days thereafter. He testified at the trial that he had never fully recovered from the effects of the toxemia caused by drinking from the bottle in question; but, as the extent of plaintiff's injuries is not an issue at this time, no further statement on that subject is necessary.

Plaintiff turned the bottle over to his physician, Dr. J. H. Padfield, of Springfield, and it was by him delivered to plaintiff's attorney of record in this case. It was identified by the plaintiff and

Dr. Padfield at the trial, and was introduced in evidence and exhibited to the jury.

Harry Elam, of Springfield, 32 years of age, qualified as an expert in "the habits and customs of insects of various kinds," including the "dirt dauber," known to natural scientists as the "solitary wasp." Mr. Elam had examined the contents of the bottle in question at the office of plaintiff's attorney prior to the trial, and he had it before him when he testified at the trial. He stated that the dirt dauber usually builds its nest in a jug or bottle or some secret place; that he builds it of mud or anything he can find of that type, and puts a shell inside and lays an egg which forms a chrysalis; that if it is a male wasp he puts in five spiders and if a female wasp she puts in ten spiders and then seals up the nest; that the spiders are placed in the nest to be used as food for the "young larvæ" during the process of development after hatching.

Mr. Elam testified that he found in the bottle in question spiders and mud, and that he was satisfied from his examination it contained the remains of a dirt dauber's nest.

All the Coca Cola sold by J. W. Martin at his store was bottled and delivered to him by defendant. Defendant's truck delivered Coca Cola at Martin's store on Tuesdays and Saturdays of each week, if any was needed, in wooden cases, with twenty-four bottles in each case. When delivered, the cases were placed, behind and under the counter, and remained there until they were taken out, in smaller quantities from time to time, and placed in the icebox for sale.

In the regular routine, the bottles, after they were emptied, were placed back in the cases and were carried back to defendant's plant by defendant's truck on its regular rounds for making deliveries.

During the period covered by the transactions involved in this case, and for several years theretofore, the defendant had a mixing and bottling plant at Springfield, in Robertson county, at which all the Coca Cola handled by J. W. Martin was bottled. No other bottling plant sold any Coca Cola in Martin's territory.

Defendant's main plant was at Nashville, and it had plants at other points, including the plant at Springfield. E. F. Judd was manager of the main plant at Nashville and had supervision over the plants at Springfield and other points. Tom Wells was local manager of defendant's plant at Springfield.

E. F. Judd had had long experience in the management of defendant's plants and had visited other bottling plants. He testified that defendant's plants, including the plant at Springfield, were equipped with the highest type of bottling machinery known to the trade. He described in minute detail the process of cleansing

the bottles before they were filled with Coca Cola syrup and carbonated water. The description of this process, in the testimony of Mr. Judd, covers many pages of the transcript, and we do not think it necessary to repeat it here. The main features of this process have been described in reported opinions of this court which we have cited herein.

Mr. Judd testified that the caustic solution in which the bottles were kept for twelve or fourteen minutes in the course of cleansing and sterilization would eat and destroy any and all animal matter such as spiders, worms, and bugs, and would dissolve mud, clay, and dirt, and that the repeated rinsing of the bottles, in an inverted position with a heavy water pressure, both before and after they were placed in the tank of caustic solution, would remove any and all foreign matter from the bottles.

Tom Wells, manager of the Springfield plant, also testified that the caustic solution would "eat up animal matter" and would "make slush of and dissolve a hard clay ball if it is inside of a bottle."

The only evidence in the record which tends to show a lack of the highest degree of care in the usual process of bottling at defendant's plant is the testimony of the witness ——— Keith. The substance of the testimony of this witness is contained in an excerpt therefrom as follows, viz:

"Q. I beg your pardon, I didn't make it clear. Now, just how was this inspector that was supposed to be inspecting those bottles there before putting them in the cases, how was he doing his work? A. Well I don't know what it was there, but he knew how to catch three bottles, three in each hand, and fill in a place; every one fit perfectly in, and you could see anything in there, a crack in the bottle or anything in there, just as clear as it could be, and he talked to me and was going on about his business; he put some in there and didn't look at them; he put some in and didn't look at them only once in a while, and that was, I don't know—

"Q. Was he inspecting every bottle he put in there, Mr. Keith? A. No, sir, he didn't see every bottle he put in there.

"Q. When he would be dropping them in there and talking to you, how would he be looking with reference to the bottles he was handling? A. They were right in front of him, in a trough, sort of; and he would catch them and set them over; it was just as natural as could be, he went ahead and talked to me, and sometimes he looked at his work, and just went on that way.

"Q. How long did you stay there when he was going on with that work that way? A. I don't know; I guess I stayed there ten minutes, maybe fifteen."

The witness Judd stated that the mere fact that a bottle "gurgles and sizzles" when the cap is removed is not evidence that the·

cap has not been removed since the bottle left the plant; that when the cap is pulled off "the gas volume that is absorbed in the bottle down below the top of the Coca Cola line will not come out until that bottle warms up to a certain temperature and stays open for quite a while, until that gas gradually comes out of the fluid; and that he had opened them after they had been opened two or three times, and they would "spout."

With one important exception (to which we will presently refer), the foregoing is an outline of the material evidence in the case.

The learned trial judge was of the opinion that there was evidence to support every essential element of plaintiff's cause of action, save one; and that one was evidence that the "deleterious substance" was in the bottle when it left defendant's place of business. His honor held that, as to this essential matter, "the jury would have to deal solely in speculation, and would have to base a verdict for plaintiff solely upon speculation."

Of course, if the trial judge was right in his view that a verdict for plaintiff would be based upon speculation, he did not err in directing a verdict for the defendant; for "a verdict cannot be based on a conjecture." Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 396, 242 S. W., 646, 648; Chicago, etc., Railway Co. v. Coogan, 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed. 1041, 1045.

In all our Coca Cola cases, supra, the rule has been recognized that, in order to support a verdict for plaintiff, there must be evidence from which it could be reasonably found that the foreign substance was in the bottle when it left the possession of the defendant Bottling Company, and that there had been no reasonable opportunity for evil-disposed persons to tamper with the bottle after it left the defendant's possession and before it was delivered to the plaintiff. See Coca Cola Bottling Works v. Selvidge, 4 Tenn. App., 558, at pages 562, 563; Roddy Mfg. Co. v. Cox, 7 Tenn. App., 147, at page 151; Coca Cola Bottling Works v. Lewis, 9 Tenn. App., 485, at page 489; Coca Cola Bottling Works v. Kennedy, 13 Tenn. App., 199, at page 202; Yates v. Coca Cola Bottling Works, 14 Tenn. App., 7, at page 10; Coca-Cola Bottling Co. v. Rowland, 16 Tenn. App., 184, at pages 192-193, 199, 66 S. W. (2d), 272; Merriman v. Coca Cola Bottling Co., 17 Tenn. App., 433, page 437, 68 S. W. (2d), 149.

On this point, we quote excerpts from the cross-examination of plaintiff's witness J. W. Martin, as follows:

"Q. All right. Now then, that is your store, and you are the only clerk in there, and you stand up to the front, and lots of times you would be waiting on a customer up here and maybe some customer back here at the back? A. Yes, sir.

"Q. And you have had lots of times a fellow go and get a cold

bottle out of the box, and then comes up and says, I have got a bottle, and pays you for it? A. Yes, sir, that happens very often.

"Q. When you would be waiting on somebody else? A. Yes, sir.

"Q. And the bottled drinks that you had delivered there at that time, in April, 1934, and for some weeks prior thereto, all the Coca Cola that you purchased, you purchased it from this plant in Springfield; you know that is so, isn't it? A. Yes, sir.

"Q. You would keep it in the ice box to keep it cold, don't you? A. Yes, sir.

"Q. And you keep the Coca Cola, the supply you don't have in the ice box, over there near the passage behind the counter? A. Yes, sir.

"Q. In other words, if I wanted a bottle of Coca Cola, or any other customer, all he had to do was to go get out a bottle of Coca Cola, if you happened to be busy? A. He could do it.

"Q. And that is the way it was in April, 1934; that is the way you kept the stuff there? A. Yes, sir. . . .

"Q. You testified a while ago that that bottle of Coca Cola which is Exhibit A or Exhibit 1 to Mr. Hoback's testimony was a bottle of Coca Cola that you purchased from the Coca Cola plant here in Springfield; you know that is so? That is correct? A. Yes, the one I gave him came from the Plant.

"Q. Now, I want you to explain to me how you know that is so? A. Me?

"Q. Yes. Let's go over this thing. Here you are, up here at the front end of the store; you are waiting on folks over here, and sometimes you are waiting on folks over here, and here are people here around this Coca Cola place, and here are people over here; you just don't watch those people all the time; you just can't, can you? A. No, sir.

"Q. You can't do it? A. No, sir.

"Q. And it is the easiest thing in the world for a fellow to come in there and slip a bottle of Coca Cola in that ice box and you not know anything about it? A. Of course—

"Q. That is right, and that was so on April 9, 1934, this year? A. Slipped it in there?

"Q. No, sir, not that; I say that could happen in April, 1934, this year? A. Yes, sir, it could have; when a customer is in there I go out the side door, and out to the front door here—

"Q. So when you testified a while ago that this very bottle that is sitting there as an exhibit to Mr. Hoback's testimony was a bottle of Coca Cola that you purchased from the Coca Cola plant here in Springfield, you don't know that to be true, do you? A. I don't know where that bottle come from.

"Q. That is it, yes sir. Now then, I want to ask you this ques-

tion, if in your store there, there hadn't been, time after time, before April, 1934, that people had been in your store and gotten Coca Cola and walked away with the bottles and you never knew anything about it? A. It has been done.

"Q. Yes, sir, prior to April 9, 1934, before April 9th, 1934? A. Yes, sir. . . .

"Q. Now, Mr. Martin, you don't stand there over that ice box all the time and keep a watch over it after you put the Coca Cola in it, do you? A. Oh, no.

"Q. And you don't stand over the Coca Cola cases after they are delivered there by this bottling plant, do you? A. No, sir.

"Q. And as far as you know, somebody may have come in there and slipped a bottle of Coca Cola in that ice box that came from Kalamazoo, Michigan, as far as you know? A. They could do it.

"Q. And as far as you know, and as far as you ask this jury to gather from you, is, that the only Coca Cola you purchased, you purchased here at the plant at Springfield? A. Yes, sir.

"Q. And that is all that you are asking them to know, as far as the bottle you gave Mr. Hoback is concerned? A. Yes, sir.

"Q. That the only Coca Cola you purchased came from the Springfield plant? A. Yes, sir.

"Q. Whether the particular bottle you sold Mr. Hoback came from this Springfield plant or not, you don't undertake to say, because you don't know whether somebody slipped a bottle in there or not, is that correct? A. Well, a man could come in there with a bottle and slip one in there, or slip one in there and take one off.

"Q. And that may have been done as far as you know, as to the bottle you sold Mr. Hoback? A. Yes, sir, as far as I know."

On redirect examination, J. W. Martin stated that the only Coca Cola bottles he put in his icebox were delivered to his store by the Springfield plant, and that he had never heard of anybody slipping bottles in his icebox or in the cases under the counter, and had never heard or known of anybody taking the caps off the bottles and putting them back.

On recross-examination, J. W. Martin was asked and answered as follows:

"Q. Just one question: you testified on a re-direct-examination just a moment ago that the only Coca Cola that you ever put in the icebox came from the cases that you got from this local plant here? A. Yes, sir.

"Q. Now, I am going to have to ask you again—that is the the same question I asked you before—if there are not plenty of opportunities for people to come in there and put in that case down there a bottle of Coca Cola that came from somewhere else and not from this defendant company, isn't that true? A. Yes, sir."

When the undisputed testimony of J. W. Martin which we have quoted is considered in connection with the undisputed evidence with respect to the efficacy of defendant's cleansing and bottling process to remove from the bottles all foreign substances, we agree with the trial judge in his conclusion that a verdict for the plaintiff would necessarily be based on "speculation." If, in a case of this character, such undisputed evidence of opportunities for the bottle in question to have been placed in Martin's store by some one other than defendant's agents may be disregarded, there will be no way "left open for the innocent to escape." Crigger v. Coca-Cola Bottling Co., supra, 132 Tenn., 545, at page 552, 179 S. W., 155, 157, L. R. A. 1916B, 877, Ann. Cas. 1917B, 572.

It results that plaintiff's assignments of error are overruled and the judgment of the circuit court, dismissing plaintiff's suit at his cost, is affirmed.

The costs of the appeal will be adjudged against the plaintiff, Hoback.

Crownover and De Witt, JJ., concur.