## JORDAN v. COCA COLA BOTTLING CO. OF UTAH

No. 7347. Decided May 24, 1950. (218 P. 2d 660.)

Rehearing Denied September 28, 1950.

See 36 C. J. S., Food, sec. 59. Foods, presumption of negligence from foreign substances in, see note, 171 A. L. R. 1209. See, also, 38 Am. Jur. 989.

E. Ray Christensen, Salt Lake City, Arthur E. Moreton, Salt Lake City, Ray R. Christensen, Salt Lake City, Elias L. Day, Salt Lake City, for appellant.

Mark S. Miner, Salt Lake City, Wendle R. Jones, Salt Lake City, for respondent.

PRATT, Chief Justice.

This action was commenced by the plaintiff to recover for injuries allegedly sustained by him as the result of drinking a bottle of contaminated Coca Cola. From a verdict and judgment for plaintiff, defendant appeals.

The facts are as follows: Plaintiff is employed by the American Smelting & Refining Company, at Garfield, Utah. On October 5, 1948, he purchased a bottle of Coca Cola from a vending machine on the premises of his employer. The injury complained of consisted of his becoming sick and nauseated and remaining sick intermitently for three days, and suffering from nausea and diarrhea. This condition resulted from the drinking of the Coac-Cola, which, according to the testimony contained three flies and other foreign matter. Introduced in evidence as an exhibit on behalf of the plaintiff was a bottle of Coca Cola containing two flies and other impurities, which bottle was identified as the one from which he drank.

Plaintiff purchased two Coca Colas from the vending machine, giving one to a fellow worker. This fellow employee and another were present when plaintiff began to drink the Coca Cola, and both testified that the plaintiff expectorated into his glove, and that there was a fly therein which he put back in the bottle. In addition, one fly remained in the bottle. Plaintiff indicates that he swallowed a third fly. Plaintiff lost no time from work, and saw no doctor.

The Coca Cola dispensing machine was leased to the American Smelting and Refining Company by the Coca Cola Company of Salt Lake City, and it was serviced by this latter company on substantially a daily basis except for week-ends and holidays. The driver of the Coca Cola truck had keys to the machine, as did also two company guards. In addition, approximately twelve guards had access to keys to the machine, so that they could refill the vending mechanism from the storage space inside the machine or from the extra cases of Coca Cola left by the driver in the foreman's office. These latter guards did not have access to the key to the money box. The American Smelting and Refining Company paid for the Coca Cola delivered by the driver, and the Coca Cola Company had no interest in the coins going into the machine. All proceeds from the machine belonged to the American Smelting and Refining Company.

The amended complaint charged negligence in bottling. Plaintiff contended, and contends that the doctrine of res ipsa locquitur applies to the case. This the defendant denies, but did nevertheless produce evidence tending to show an absence of negligence on the part of the defendant.

The operation of the Coca Cola plant in Salt Lake City was described in considerable detail. Peter Hanes, maintenance man for the defendant Company, testified that the machinery used by the defendant was the most modern and up-to-date equipment in use in the industry, and that he had never seen a finer plant and he had visited a great number of bottling plants. The plant operations as he described it consists of the bottles entering the washing machine into a rinse where tubes extend into the bottles and rinse the bottles for four seconds. The temperature of this rinse water is 70°. This rinsing process is again repeated. After the two rinses, the bottles pass to number one caustic tank containing a 3% caustic soda solution, heated to a temperature of 110°. The bottles remain in this tank for four minutes. They are then removed, drained

and placed in another tank containing this time a 2% caustic soda solution heated to 150° and there remain four minutes. The bottles are removed, drained, and placed in a third caustic soda solution, this time a 1% solution heated to 130°, and remain there for four minutes. They are then rinsed in fresh water heated to 100° for three and one-half to four minutes. The bottles are then drained, and the actual washing process begins.

The bottles proceed from this point through some brushes which wash the outside of the bottles. They then go to the "first rinse" and receive an inside rinse. This consists of a rinse tube which shoots water into the bottles at a pressure of 60 pounds. This tube goes up and then down inside the bottle, rinsing all the time, the bottles being inverted.

The bottles then pass to the first "inside brushes" which brushes go inside the bottles and brush the sides and bottom of the bottles. These brushes revolve at 1200 RPM with water passing through the center of the brushes at 60 pounds pressure. This brushing process continues four seconds.

The brushing process is then repeated by a second set of inside brushes. Both sets of inside brushes are made of nylon. The brushes are considerably larger in diameter than the inside of a Coca Cola bottle, and are so constructed as to reach all parts of the bottles. The bottles then proceed through two plain water rinses.

Thereafter, the bottles pass a visual inspector in a single line. The inspector has a fluorescent light with a non-glare plate behind it to aid him in examining the bottles.

After the visual inspection the bottles pass to the syruper through an open space of approximately two feet. The syrup comes through an enclosed line equipped with two screens. As the syrup is being put in the bottles, a collar fits over the bottle and protects it from contamination. The bottles then go to the apparatus which puts in carbonated water, the distance between these processes being approxi-

mately 18 inches. This machine is also equipped with a collar which fits over the mouth of the bottle as it is being filled. The water comes from enclosed lines, after having been specially filtered and treated. The bottles then pass another open space of about eighteen inches, to the capper. After being capped they move to the mixer, where the bottles are inverted and spun at 3000 RPM.

The bottles then proceed to an automatic eye inspecting machine which automatically rejects any bottle having a defect, or one containing foreign substance.

It was admitted by Hanes that if the water pressure during the washing process reduced below 60 pounds, that the bottles would not be properly rinsed.

Raymon Wilmert, a field engineer for the RCA Corporation which corporation was the seller of the electric eye device described the operation of the electric eye machine. As he described this inspection, it consisted of the bottles remaining still as they pass through the eye, but the fluid inside is whirling, and any sediment, particles of dust or other foreign substances in the Coca Colas will result in those bottles being rejected by the machine.

Three test bottles of Coca Cola were introduced in evidence into which impurities had been deliberately placed, according to testimony, and had been deliberately put into the line and through the machine many times and they had been rejected every time. One bottle contained a cork floating on top; one a No. 12 shot (very small) ; and the other contained a bristle or bristles from the nylon brushes. Mr. Wilmert testified that the bottle containing flies and other impurities identified as the one from which plaintiff drank could not possibly go through the inspecting machine without being rejected. On cross-examination he testified that a fly covered with syrup in the bottom of a bottle would cause such a bottle to be rejected by the machine, and that whenever the machine was out of order, instead of allowing all bottles to pass through, it would

reject all bottles, and the bottling process would then have to cease until the machine was repaired. Mr. Wilmert indicated that he knew of no better machine on the market than was this machine.

Dr. Curtis, a bacteriologist and sanitarian and former chief sanitarian for Salt Lake City, testified that the defendant's plant was well kept and clean and that the hot caustic solution would dissolve organic matter present in the bottles, and that it was highly improbable that the flies could go through this process and retain their identity as did these flies.

A Salt Lake City health officer testified that he had inspected defendant's plant regularly, and that the plant was clean and well kept up, that the screens were up during September and that he had never seen insects in defendant's plant.

George Walker, driver of the Coca Cola truck, testifying on cross-examination indicated that at various times when he had been filling the vending machine at the American Smelting and Refining Company plant, men at the plant had come to him with warm bottles of Coca Cola and asked him to exchange them for cold, and that he had made such exchanges, and loaded the warm Coca Colas in the vending machine. Where these warm bottles came from he did not know.

The manager of the defendant plant testified that there were other Coca Cola companies in Utah, independent of this plant and having no connection therewith; that although Salt Lake City and vicinity was the territory of the plant at Salt Lake City, that foreign Coca Cola did come in from other areas although not authorized.

Plaintiff produced no further evidence other than that connecting this bottle of Coca Cola with the vending machine, and the defendant company.

This type case is one deserving of extremely close scrutiny in that a blanket assertion of the general rules of negligence on the one extreme results in plaintiffs being for all practical purpose completely foreclosed from recovery because they will never be able to establish specific acts of negligence in relation to the specific thing or article causing the injury, and thus they may suffer a grave hardship. On the other hand, if the doctrine of res ipsa loquitur is to be applied so as to allow the establishment of a prima facie case for plaintiffs every time such party produces a bottle and says it was contaminated, then the opposite extreme is reached and honest business men are at the mercy of unscrupulous persons and of practical jokesters who might easily fabricate a case of liability. Either extreme appears undesirable.

The numerical weight undoubtedly favors the view that the doctrine of res ipso loquitur does apply in cases generally of this type. Respondent has cited numerous cases to that effect. There are many others. Four annotations on the subject cover a great number of these cases, setting out the authorities on both sides. They are: 4 A. L. R. 1559; 47 A. L. R. 149; 105 A. L. R. 1040; and 171 A. L. R. 1209.

Appellant's argument is that the doctrine of res ipsa loquitur cannot be applied in this case because there has not been the exclusive control required and contemplated under that doctrine, citing 38 Am. Jur. 996, Negligence, Section 300; Shearman and Redfield on Negligence, Rev. Ed. 153, Section 56; *Jenson* v. *S. H. Kress & Co.*, 87 Utah 434, 49 P. 2d 958.

Respondent takes the position that here involved is a sealed product which changes the general principle as to exclusive control, and allows the use of the doctrine of res ipso loquitur although the article has left the possession and control of the defendant. Of this more will be said later.

An examination of the authorities here in this state indicates that where the doctrine of res ipsa loquitur applies, it only amounts to an inference of negligence from the facts, from which a jury could find negligence. It is recognized however, that in certain cases the inference may be so strong as to compel a finding of negligence. *Williamson* v. *Salt Lake & Ogden R. Co.*, 52 Utah 84, 172 P. 680, L. R. A. 1918F, 588; *Zoccolillo* v. *Oregon Short Line R. Co.*, 53 Utah 39, 177 P. 201; *Angerman Co., Inc.* v. *Edgemon*, 76 Utah 394, 290 P. 169, 79 A. L. R. 40; *Passey* v. *Budge*, 85 Utah 37, 38 P. 2d 712; *Jenson* v. *S. H. Kress & Co.*, supra; and *White* v. *Pinney*, 99 Utah 484, 108 P. 2d 249.

A further refinement on the application of the maxim res ipsa loquitur appears in the case of *Jenson* v. *S. H. Kress & Co.*, supra, in which case this court determined the doctrine did not apply, and speaking through Mr. Justice Wolfe stated:

"It [res ipsa loquitur] applies where the thing from or by which the apparent negligence speaks is shown to be under the control or the management of the store and the accident is such as, in the ordinary course of things, does not or would not happen if those who had the management used the proper care. Where the way in which the accident happened warrants an inference of negligence, then the mere happening speaks for itself. Even then it is only evidence from which the jury may infer negligence. It is not negligence in law. See *Williamson* v. *Salt Lake & Ogden R. Co.*, 52 Utah 84, 172 P. 680, L. R. A. 1918F, 588. If the circumstances are equally consistent with a cause which would not be attributable to negligence, then the doctrine does not apply. The stage is set for the happening of the accident as the victim walks upon it. If, from the set stage as it was before the accident happened, it can be inferred from the setting itself that there was an omission or commission of the management amounting to negligence, then the thing itself speaks * * *

"In the instant case it was just as consistent that the plaintiff herself or some other custommer had leaned against the showcase, wrenching the panels and thus splitting off a piece of glass, as if the defendant had done it negligently." [87 Utah 434, 49 P. 2d 960]

An examination of the cases indicates that the rule of exclusive control before the doctrine of res ipsa loquitur

may be applied is relaxed in those cases which fall within the category relating to products for human consumption as "sealed products." See A. L. R. annotations cited above. For a pronouncement of the general rule see 38 Am. Jur. 996 to 1000, Negligence, Section 295-303 inclusive.

It is an extension to the concept of control of the product that is the foundation for including sealed products within the application of the doctrine of res ipsa loquitur. This extension is reasonable and is the undoubted weight of authority. It should not, however, be without certain qualifications.

In a sense, the "sealed product" principle is just another way of saying that the control by the manufacturer of the article extends throughout the entire chain of transactions leading up to the ultimate consumption of the product, because of the negligible possibility of tampering with the container in which the product was originally placed, without that tampering being evident to the consumer. It is an extension of the control doctrine incident to the effect of sealing the product in a container.

"Sealed products" is a phrase which may and does have a variety of meanings, ranging from the actual sealing of a container, or the sealing of the can as in the case of canned goods, such as beans,—which sealing must, of necessity, remain intact until the product reaches the ultimate consumer, since it cannot be duplicated or tampered with and resealed to avoid detection;—to the folding over and stapling of a cellophane bag which can, by the use of some care, be opened and then closed in a manner identical with the original stapling.

A case which very aptly sets forth these distinctions is *Coca-Cola Bottling Works* v. *Sullivan,* 178 Tenn. 405, 158 S. W. 2d 721, 725, 171 A. L. R. 1200, where four different situations are set forth as follows:

"At least four such essential different situations of fact are presented in the cases dealing with liability of the manufacturer to the

consumer injured by foreign substances in food and drink packages. One, where the package or bottle passes directly from the agent of the bottler or manufacturer to the consumer; and, two, where the package or bottle comes from the manufacturer so sealed, as food or drink in cans, or otherwise so constructed that its contents reach the consumer without possibility of alteration by intermediate parties, for example, glass in canned pork and beans, *Campbell Soup Co.* v. *Davis*, 163 Va. 89, 175 S. E. 743. In both of these cases the facts clearly justify the application of the res ipsa loquitur doctrine, that 'the thing speaks for itself,' applied in many of the decisions, either nominally, or in effect. (Some jurisdictions limit application of this doctrine to cases of sealed cans or packages. 22 Am. Jur. 902, citing cases.) Third, where the foreign substance is so planted or imbedded in the article purchased by the consumer, that its physical location therein conclusively demonstrates its presence there when the article came from the manufacturer, as when found compressed within a plug of tobacco, or in a cake (of both of which the purported cases afford illustration.) Here, again, the thing speaks for itself, not only as to the negligence, but as to the prima facie responsibility of the manufacturers therefor.

"But, there is a fourth class of cases, in which the instant case falls, which presents the difficulty with which we here have to deal; the cases of soft drink, or milk bottles, or the like, enclosed by caps which it is possible to remove and replace, by the use of care. We have here a distinctive element of fact which breaks the conclusive continuity of control between the bottler and the consumer, when the physical possession has been in a third party, such as an intermediary vendor. To close this gap of control so as to make fairly applicable the rule of presumptive or prima facie negligence on the part of the bottler or manufacturer, we are of opinion that a higher degree of proof must be made that there has been no reasonable opportunity for tampering with the bottle, or its contents, in the interim between the physical control of the bottler or manufacturer and that of the consumer."

The instant case falls within the fourth situation. It is obvious to all of us that a cap of the type used on bottled soft drinks may be removed and replaced in such manner as to practically defy detection. The aspect of control by the bottler of the product until it reaches the ultimate consumer thus loses much of its pursuasive weight where there exists the ability for undetected tampering with the pro-

duct after it leaves the hands of the person sought to be charged, and an inability to detect such tampering.

Whereas the almost inescapable conclusion to be drawn from the existence of a deleterious substance in a can which has remained sealed prior to being opened by the ultimate consumer, is that such substance must necessarily have been in the can at the time it was sealed, no such conclusion is required where the sealing is such that it can be removed and replaced without detection. Particularly is this true where there is shown to be opportunity for tampering. In other words, the only time that the doctrine of res ipsa loquitur should apply to a "sealed product" in the latter category, is when the plaintiff has shown that there was an absence of opportunity for tampering so that in effect the court could conclude that there was extended control over the product by the manufacturer until it reached the ultimate consumer, or where the product passes directly from the manufacturer to the consumer without passing through intermediate hands. To like effect is the *Sullivan* case, quoted above. See also: *Wilkes* v. *Memphis Grocery Co.,* 23 Tenn. App. 550, 134 S. W. 2d 929, rehearing denied, *Wilkes* v. *Jones,* 24 Tenn. App. 36, 139 S. W. 2d 416; *Hoback* v. *Coca Cola Bottling Works,* 20 Tenn. App. 280, 98 S. W. 2d 113; *Jenkins* v. *Bogalusa Coca Cola Bottling Co.,* La. App. 1941, 1 So. 2d 426; for cases holding that plaintiff failed to establish with sufficient certainty that foreign objects were in bottled beverages when they left the manufacturer and the evidence failed to establish that there had been no reasonable opportunity for tampering.

The evidence in the present case fails to establish lack of opportunity for tampering, but on the contrary establishes numerous opportunities for tampering by mischief minded persons or those bearing genuine ill will, as well as opportunities for substitution. We are informed of no less than fourteen persons having access to the vending machine, in addition to the fact that the key hanging in the guard closet presented an opportunity for others to gain

access to the machine. There is nothing to indicate that there was not even more opportunity for tampering with the Coca Cola stored in the foreman's office. Factories and manufacturing plants where many men are thrown together, are noted for the horseplay and practical joking which there takes place, often with serious results. Another explanation is as consistent with the facts of this case as is the indication that defendant's negligence caused the injury. *Jenson* v. *S. H. Kress & Co.,* supra. We conclude that plaintiff has failed to make out a case rendering the maxim and doctrine of res ipso loquitur applicable.

The defendant produced evidence of a method of cleaning and washing the bottles, of refilling them and of inspecting them visually and electrically, all of which substantially rules out the likelihood of this bottle of Coca Cola having been bottled in its existing condition by this bottling plant. We conclude that there is not sufficient evidence on behalf of the plaintiff to sustain the burden of establishing a case for the jury.

Respondent made several cross-assignments of error, all of which relate to a theory of breach of warranty, which he sought to inject into the case. The pleadings reveal no such issue or theory in the case, and the trial court thus properly refused to instruct on this theory.

The judgment is reversed and the case remanded for dismissal. Costs to the appellant.

McDONOUGH, J., concurs.

WOLFE, J., concurs in the result.

LATIMER, Justice.

I dissent.

It seems to me that the Chief Justice, in stating the facts on exclusive control, has not set forth some of the facts beneficial to respondent. The jury having returned a verdict in his favor the facts and inferences most favorable to him should be used as the basis for the decision.

However, the important question in this case is one of law and not of fact.

If we are to limit the doctrine of res ispa loquitur in bottled drink cases to a class where there is an absence of opportunity for tampering, then we deny recovery to practically every consumer. Bottlers of soft drinks very seldom deliver direct to consumer and whenever a sale is made through retail channels or through vending machines there is an opportunity to tamper if someone decides to become an impractical jokester. The majority opinion concedes that a cap can be removed and replaced without detection except by an expert. In addition, a bottle must be left open for some considerable length of time before the liquid will lose its effervescent qualities. How then can a purchaser reasonably determine that a bottle has been opened and resealed? In this case respondent claims that the cap was fairly hard to remove and that it came off just the same as other caps he had removed from bottles of Coca Cola. This is evidence from which the jury could conclude that the bottle had not been previously opened, and, there is no evidence to the contrary. There is merely speculation that it was possible someone might have removed the cap, placed the flies in the solution, recapped the bottle, placed it in the vending machine without knowledge as to the individual who might be the victim of the prank.

Rather than venture into the realm of speculation and surmise, I prefer to adopt the concept of those authorities which hold that in cases involving bottled drinks the question of whether or not the deleterious substance was in the bottle at the time of delivery, is a jury question if the substance is in the bottle at the time of purchase and there is no evidence that the bottle has been previously opened. It must be realized that the same rule of law would be applicable had the contents of the bottle been poisonous. Had that situation been presented to us, I have grave doubts we would have concerned ourselves with tricksters.

WADE, J., concurs in the dissenting opinion of LATIMER, J.