Sallie E. HAMILTON and Azra Hamilton,
Appellants,

v.

PEPSI COLA BOTTLING COMPANY OF
WASHINGTON, D. C., a corporation,
Appellee.

No. 1964.

Municipal Court of Appeals for the
District of Columbia.

Argued April 8, 1957.

Decided June 5, 1957.

Rehearing Denied June 26, 1957.

Samuel G. Silverman, Washington, D. C., for appellants.

Frank J. Martell, Washington, D. C., with whom Richard W. Galiher and William E. Stewart, Jr., Washington, D. C., were on the brief, for appellee.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

QUINN, Associate Judge.

Appellant Sallie E. Hamilton, plaintiff below, filed suit against appellee to recover damages for injuries allegedly sustained as a result of drinking a portion of a bottle of Pepsi Cola which contained a rolled up paper match cover and three or four matches. Her husband joined in the action for out-of-pocket expenses and loss of consortium. Appellee denied any negligence on its part and pleaded contributory negligence on the part of Mrs. Hamilton. A jury trial resulted in a verdict and judgment for appellee and the Hamiltons appealed.

As is usual in these cases, plaintiffs could not prove a specific act of negligence by defendant and consequently relied on the doctrine of *res ipsa loquitur*. Accordingly, they were required to show that the foreign substance was in the drink which was manufactured by defendant, that Mrs. Hamilton drank from it, and suffered the resulting injury.[1] Evidence was introduced tending to indicate that the drink in question was manufactured by defendant and remained under its complete control until delivered to a delicatessen near Mrs. Hamilton's home, where it was placed in a cooler to which the customers had free access.

According to Mrs. Hamilton, on the afternoon of August 30, 1955, she removed the bottle of Pepsi Cola from the cooler and purchased it along with other groceries. After dinner that evening she opened the bottle and consumed a part of its contents. She noticed a bitter taste but continued to drink until "something struck [her] mouth [and] went down through [her] throat." She raised the bottle and detected something in the center, and then became nauseated, vomited, felt pains in her stomach, and passed some blood rectally that night and again the next morning. The pain continued for six days and Mrs. Hamilton was unable to resume her normal activities as a housewife for about ten days, during which time she lost eight pounds.

A considerable amount of medical evidence relating to the nature and extent of Mrs. Hamilton's alleged injuries was introduced. Plaintiffs called the doctor employed by defendant to make an analysis of the contents of the bottle.[2] He testified that in his opinion the chemicals found in the bottle would produce nausea and vomiting in a person with a "weak stomach" but that they could not cause any damage to the stomach, colon or rectum, or result in any bleeding. He suggested that the blood may have been the product of a hemorrhoid condition Mrs. Hamilton was known to have, but stated that he did not believe the ingestion of the chemicals could have aggravated or affected that condition in any way.

A physician consulted by Mrs. Hamilton then testified that according to his diagnosis, the consumption of the materials in the bottle created a condition of acute gastritis and produced the vomiting which, in turn, caused a strain that irritated her dormant hemorrhoid condition. On cross-examination, however, he stated that the

---

1. Washington Coca-Cola Bottling Works v. Kelly, D.C.Mun.App.1944, 40 A.2d 85; Fisher v. Washington Coca-Cola Bottling Works, 1936, 66 App.D.C. 7, 84 F.2d 261.

2. Suit was not brought until a year after the incident in question, and the analysis was made some three months later. Mrs. Hamilton testified that she kept the bottle in her refrigerator from the time she first sustained her injury until delivery to defendant.

appearance of a foreign object in the drink may have been an important factor in causing her illness; that the acute gastritis and vomiting may have been the result of a psychological reaction which Mrs. Hamilton experienced upon seeing the strange object in the liquid.

The defense was that defendant was not responsible for the presence of the match card in the drink, but that it must have been placed in there by someone else after the bottle left its control. Accordingly, defendant introduced detailed evidence as to the care taken at its bottling plant. Its superintendent related the successive steps by which each bottle was cleansed and elaborated on the continuous inspection given the bottles, whether new or previously used, both before and after filling.

At a bench conference counsel for defendant requested and received permission, over objection, to perform an experiment. He proposed to mark four bottles of Pepsi Cola, and then open and reseal two of them out of the presence of the jury. The bottles were then to be exhibited to the jury and he would "ask the jury if they can tell [him] which of those bottles has been opened and resealed and which has not."

Two of the four bottles were opened and recapped, and the four bottles distributed to the jury for inspection. A defense witness who had observed the operation then testified that bottles Nos. 2 and 3 were the ones that had been opened. At this point the stenographic transcript shows the following colloquy:

"Mr. Martell [counsel for defendant]. I would just like to ask one of the jurors which one he got.

"A Juror. I got No. 2.

"A Juror. I got No. 4."

3. 20 Am.Jur., Evidence, § 755.
4. See, e. g., Jordan v. Coca Cola Bottling Co. of Utah, 1950, 117 Utah 578, 218 P.2d

Other evidence was introduced but we have indicated enough to supply background for the questions raised here.

■ Plaintiffs question the admissibility of the experiment and particularly complain that it was performed *with* the jury. As a general rule, experiments may be performed in court in the presence of the jury for the purpose of proving disputed facts provided they are conducted under similar conditions and circumstances to those existing in the case at issue, and the trial judge has broad discretion in determining whether they should be permitted.[3] As we have indicated, the defense was based on the theory that tampering had occurred after the bottle left defendant's control, and accordingly the object of the experiment was simply to illustrate the claim that the bottle cap may be removed and replaced in such a manner as to escape detection. Such a fact was important and relevant to the defense, and thus evidence tending to prove it was admissible.[4] In view of the purpose of the experiment, the only similarity of conditions required was a similarity of bottle caps, and there was ample evidence on this point. We cannot hold that admission of the experiment was an abuse of discretion.

■ One aspect of the experiment merits further discussion. When it was initially proposed at the bench conference, counsel stated that he wanted to "ask the jury if they could tell [him] which of those bottles has been opened and resealed and which has not." Had such a question been asked, it would have been highly improper. In Henderson v. Union Pac. R. Co., 1950, 189 Or. 145, 219 P.2d 170, 183, during closing argument counsel asked for and extracted from individual jurors their oral agreements with him that he was correct in certain statements he was mak-

660, 664, 52 A.L.R.2d 108, 115, in which the court virtually took judicial notice of the fact.

ing, and the court held that such tactics "are reprehensible and ought not to be tolerated in a court of justice." We do not think, however, that here the questions and answers contemplated did in fact take place. As the record stands, it would appear that counsel merely asked the jurors which of the four bottles they had in their possession at that time. While the better practice would be not to permit questions of this sort to the jurors, in view of the state of the record and the fact that the question was not objected to, we cannot hold that there was error justifying reversal.

The second point raised challenges one of the instructions given by the court, as follows:

"Now, ladies and gentlemen of the jury, you are further instructed, insofar as the law in this case is concerned, and after weighing all the testimony, and considering it; and that includes, of course, the plaintiff's testimony, and the testimony of the two doctors who testified; if the plaintiff has borne the burden of proof, as we have defined it to you, that the substance in question was in this bottle of Pepsi-Cola; that as a result of consuming it, by reason of its taste, and what not, she was caused to be nauseated, and that nausea resulted in injuries to her, then, the plaintiff has carried the burden of proof on that issue, and is entitled to recover from the defendant.

However, if you find that the plaintiff, while she did consume a part of this bottle; that its contents, as such, was not the cause of her illness; that is the nausea and vomiting, and other troubles that have been related to you; if you find that those troubles and those conditions, or that condition was brought about by reason of the psychological reaction through the appearance of what was in the bottle, and what she learned was in the bottle; *that she suffered no physical injury, as such, from the contents of the bottle; and her physical injuries, whatever they might have been, were caused by a pyschological reaction to what was found to be in the bottle, then she is not entitled to recover;* because speculation would be involved as to what damages she did suffer. And, as a matter of fact, there would be a lack of proof, and plaintiff will have failed to carry the burden of proof that the materials in the bottle itself were the proximate cause of her sickness and illness." (Emphasis supplied.)

■■ This jurisdiction does not recognize a right to compensation for mere mental disturbance or anguish caused by a negligent act, unless such mental suffering arises from a physical injury caused by the negligent act.[5] The problem presented here, however, is whether there can be a recovery for injuries resulting solely from the mental disturbance caused by a negligent act. Other jurisdictions,[6] for example, have made no distinction "where physical injury follows mental anguish [from] those cases ordinarily encountered where mental anguish follows physical injury,"[7] holding that either situation requires redress.

In Perry v. Capital Traction Co., 1929, 59 App.D.C. 42, 32 F.2d 938, the court denied recovery for an "impairment of the nervous system" which was brought about by shock resulting from the accident involved, stating that it "is of such an intangible character that there is no practical standard by which the extent of the impair-

---

5. Chesapeake & Potomac Tel. Co. v. Clay, 1952, 90 U.S.App.D.C. 206, 208–209, 194 F.2d 888, 890–891.

6. See, e. g., Kaufman v. Western Union

Telegraph Company, 5 Cir., 1955, 224 F. 2d 723, certiorari denied 1956, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825.

7. Id. 224 F.2d at page 731.

ment may be determined."[8] The court continued,

"Where there has been a substantial physical injury, medical testimony and common knowledge may furnish a guide for measuring the pain and suffering incidental to the injury; but when, as here, there has been no substantial physical injury, a jury ought not to be permitted to indulge in conjecture and speculation as to the effects of alleged nervous shock or fright. There may be exceptional cases justifying a departure from the general rule (compare Green v. Shoemaker & Co., 111 Md. 69, 73 A. 688, 23 L.R.A.,N.S., 667), but the facts in these cases bring them within that rule."[9]

The test then is whether the injuries occasioned by the mental disturbance are material and substantial enough to admit of measurement by ordinary and practical standards. Here, the injuries complained of were extremely tenuous; we cannot hold that the trial judge erred in refusing to allow the jury to attempt to determine their extent.

We find no merit in the other assignments of error.

Affirmed.

8. 59 App.D.C. at page 44, 32 F.2d at page 940.

9. Id.