**Dewey CARDWELL and wife, Louvinnie Cardwell, Plaintiffs-Appellees,**

v.

**Ernest HACKETT, Defendant-Appellant.**

Court of Appeals of Tennessee,
Middle Section.

March 31, 1978.

Certiorari Denied by Supreme Court
Aug. 7, 1978.

James B. Dance, Carthage, for plaintiffs-appellees.

Solon Fitzpatrick, Carthage, for defendant-appellant.

OPINION

SHRIVER, Presiding Judge.

This suit was commenced in the General Sessions Court of Smith County, Tennessee by the issuance of a civil warrant, as follows:

"To any Lawful Officer to Execute and Return:

Summon Ernest Hackett, a resident of Smith County, Tennessee, to appear Tuesday, April 12, 1977 at 10:00 A.M. before the Judge of the Court of General Sessions for Smith County, Tennessee, at the courtroom of said Court of General Sessions at the County Courthouse at Carthage, Tennessee, to answer in a civil action brought by Dewey Cardwell and wife, Louvinnie Cardwell, residents of Smith County, Tennessee, for breach of

implied warranty, the plaintiff having purchased a mobile home from defendant on November 26, 1976 in Smith County, Tennessee to be used as a dwelling and relying on defendant's skill or judgment to furnish a suitable mobile home for dwelling purposes, said mobile home not being fit as suitable for such purpose. This 10th day of March, 1977.

/s/ Ruth Watson
Deputy Clerk, Court of General Sessions, Smith County, Tennessee"

After a hearing, a judgment was entered for the plaintiffs against the defendant for $1,500.00 and costs, from which judgment Ernest Hackett prayed and was granted an appeal to the Circuit Court, the foregoing judgment and appeal being dated May 13, 1977.

After a hearing in the Circuit Court the following judgment was entered:

## "JUDGMENT

This cause came on to be heard on this the 11th day of August, 1977 before the Honorable Willard Hagan, Circuit Court Judge, sitting without the intervention of a jury, upon the testimony of witnesses examined in open Court and the entire record of this cause, from all of which the Court is of the opinion that defendant holds himself out to the public to be a dealer in mobile homes and that plaintiffs relied upon his judgment and skill to furnish them with a mobile home to be used for dwelling purposes and that said mobile home is not suitable for said purposes.

It is, therefore, ORDERED, ADJUDGED and DECREED that plaintiffs have and recover from the defendant the sum of FIFTEEN HUNDRED ($1,500.00) DOLLARS and that said mobile home be returned to the defendant.

Defendant shall pay the costs of this cause for which let execution issue if necessary.

And to all of which the defendant excepted and prayed an appeal and same is granted and he is allowed thirty days to file his appeal bond and 90 days to file his bill of exceptions and otherwise comply with the rules governing appeals.

/s/ Willard Hagan
Judge"

From the foregoing judgment, defendant, Ernest Hackett, was granted an appeal to this Court and has assigned errors.

The facts, briefly stated, are as follows:

Plaintiffs, Dewey Cardwell and wife, Louvinne Cardwell, purchased a mobile home, or house trailer, from defendant, Ernest Hackett, on or about November 23, 1976 for which they paid the defendant $1,500.00. Before purchasing the house trailer, plaintiffs went with the defendant to the lot where it was located and examined it. Mr. Cardwell testified that the first time they went to see it, the defendant was not there and they only saw it from the outside. They later went back with the defendant and examined it again, going inside. He testified as follows:

"Q. Tell me what you saw before you bought the mobile home?

A. I never seen very much of nothing more than it needed painting more than anything else. And I saw a hole, where you could put a fist right down in the corner.

Q. Well, did you say anything to Mr. Hackett about that particular hole right there?

A. Yeah. He said. 'That don't need nothing but a plank tacked over it, that will be all right.'"

He was then asked if the trailer had anything inside it when they examined it, and he answered that it had some old furniture stored in it.

Mr. Cardwell testified that he told the defendant he wanted to live in the trailer. He testified as follows:

"Q. And you thought it would be suitable to live in?

A. That's right."

He further stated that the defendant had the trailer sent to the place plaintiffs designated.

The record shows that the trailer was equipped with a gas stove and plaintiff told defendant that he wanted it wired for an electric stove.

He further testified that after he had bought the trailer, he found two rotten holes in the walls which he had not known about before he bought it and he stated that he could see daylight between the walls and the floor.

He was then asked and answered:

"Q. In your opinion, is the mobile home fit to live in at all?

A. No, it ain't fitting for nobody to live in."

He further testified that he then asked the defendant if he could get his money back or try to get another trailer and the defendant said: "I will try." And, he further stated that no one had lived in the trailer since he bought it.

On cross-examination, Mr. Cardwell was questioned about his inspection of the trailer and stated:

"A. We went in the last time, yeah. We walked around and looked at it, but we didn't check it out real close."

It is insisted by counsel for plaintiffs that because of the furniture in the trailer, they were unable to inspect it so as to see some of the defects about which they complain; however, when asked on cross-examination about the furniture, he described it as being: "Two couches and two chairs, and two old bed mattresses."

He also testified to the fact that defendant arranged for the trailer to be turned around at the request of plaintiffs and it was reset at their request.

He testified that Mr. Hackett had told him before he bought the trailer that it was not wired for an electric stove and that after he told the defendant that he wanted it so wired, "He had the trailer rewired." The record shows that this was done at defendant's expense although it was not part of the original bargain.

Mr. Cardwell further testified that the trailer is "sitting down there right where it was at," and stated that he had not tried to sell it.

Mr. Louis Barkley, a carpenter, testified that the plaintiffs did not ask him to examine the trailer but, "some of their folks asked me to go by and look at it." He stated that he had gone by to look at it about a month or a month and a half previously. (The trial was conducted on August 11, 1977 while the trailer had been purchased in November of 1976)

Mr. Barkley testified that the trailer was in pretty bad shape, stating: "It was just in bad shape, as far as I was concerned." He was asked if he thought it was suitable to live in, and he answered: "It wouldn't be for me, no, sir."

On cross-examination, Mr. Barkley stated that he did not see the trailer in November or January and he did not know what might have happened to it since then.

Mr. William Napier, a relative of plaintiffs on whose property the trailer was placed, also testified that, in his opinion, it had deteriorated. He was asked about the furniture inside the trailer, and he answered:

"A. In the way of furniture, there was very little."

He was asked if he saw the condition that he described when he walked through there, and he stated: "I seen it when I walked through there, yes."

It was brought out on cross-examination of Mrs. Cardwell that at the trial in the General Sessions Court she had said that she thought the trailer was not fit to live in before they bought it.

The defendant, Ernest Hackett, when asked if the walls and floor of the trailer had separated, stated that if that condition existed, it occurred after he sold it to the plaintiffs. When asked if it was in livable condition, he answered:

"Yes, sir. There has been two families move out of it, been living in it for years. No one complained of it then."

Mr. Hackett also testified that he expressly stated to Mr. Cardwell before he purchased the trailer that it had a gas stove

in it and that if he wanted an electric stove, it would have to have a new switch box and a cable run to the stove because it was not wired for an electric stove. He further testified that, although it was not a part of the bargain, he later sent an electrician out there and did have the trailer wired for a stove and that it was inspected and approved by the County Inspector. He also testified that he had some other improvements made to satisfy some of the complaints of the plaintiffs and that after the electrical wiring was put in and he notified plaintiffs that it was ready for them to move in, he never heard anything further from them until he was served with a summons in this lawsuit in the following March or April.

The defendant testified that when plaintiffs were looking at the trailer prior to their purchase of it, Mr. Cardwell mentioned something about the walls around one of the windows. He testified:

"I said, 'Mr. Cardwell, that is where the windows have sweated in time and have run down on the varnish and caused it to peel up.' And, I told him that was there. I showed it to him and there was one hole that you could see through the trailer from the inside and I showed it to him, and told him there was one screw out of that carved piece of molding."

He described the furniture that was in the trailer as being two beds stacked on top of each other and two box springs and two mattresses on top of each other, and stated that there was nothing to keep plaintiffs from seeing all of the inside of the trailer.

Mr. Hackett stated that after they looked at the trailer, Mr. Cardwell said: "Well, if I get a place to set it, we probably will buy it," and a few days later they came back to the store, went back out there and went through it again, and he carried them through it twice and then they purchased it.

On cross-examination, he stated that he knew that they intended to live in the mobile home but he denied that he was actually in the business of selling mobile homes.

—Assignments of Error—

There are ten assignments which it will not be necessary to set out seriatim but they may be summarized by stating:

(1) That the Court erred in rendering judgment against defendant because there is not evidence to support the judgment.

(2) That the evidence preponderates against the judgment.

(3) The Court erred in rendering judgment against defendant because the plaintiffs inspected the mobile home before purchasing it and, therefore, there was not any implied warranty of fitness as provided in Section 47–2–316(3)(b), T.C.A.

Assignments (4), (5) and (6) assert error in rendering judgment against defendant because plaintiffs did not reject the trailer within a reasonable time after delivery; failed to state in their rejection any particular defect; and they retained the mobile home after it was rewired and approved, thus, accepting same as provided by Section 47–2–606, T.C.A.

(7) Asserts error because plaintiffs failed to notify defendant of any breach of contract, as required by Section 47–2–607, T.C.A.

(8) Asserts error in rendering judgment because of plaintiffs' failure to offer any proof of damages as to the difference in value at the time of acceptance as against its value had it been as warranted.

(9) Asserts error for failure of plaintiffs to try to sell the trailer and credit the purchase price against their claimed recovery, as provided in Section 47–2–711(3), T.C.A.

(10) Charges error in giving judgment for the purchase price and ordering a return of the mobile home since there is nothing in the pleadings to support such a judgment.

—Our Conclusions—

At the outset of the trial in the General Sessions Court, counsel for plaintiffs stated:

"We are proceeding under UCC, under Sales, Tennessee Code Annotated § 47–2–315, Implied Warranty, Fitness for a Par-

ticular Purpose. If I might quote that: 'Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.' "

Mr. Fitzpatrick responded:

"We did not breach an implied contract and he has not complied with the law after he got it. . . . All the general issues."

"THE COURT: Okay. The implied statute was just read. We will see if the facts make it applicable."

Thus, the pleadings in this case are as set forth in the civil warrant issued in the General Sessions Court unless amplified or modified ore tenus.

From the statement of counsel above quoted it is seen that the plaintiffs' case is based squarely on the statute, § 47–2–315, T.C.A., Implied Warranty.

We begin with the proposition as stated by this Court in *Hoback v. Coca Cola Bottling Works*, 20 Tenn.App. 280, 98 S.W.2d 113 (1936), that the provisions of the Sales Act, § 47–2–315, et seq., as to implied warranties are simply declaratory of the pre-existing law in this State.

As announced in a number of decisions, including *Bunch v. Etheridge*, 27 Tenn.App. 307, 180 S.W.2d 225 (1943), the burden of establishing a breach of implied warranty is on the one asserting the breach.

As was held in *LeSueur v. Franklin Limestone Co.*, 14 Tenn.App. 67 (1931), no warranty as to quality or fitness of a commodity will be implied when defects in the same are known to the buyer, or he has knowledge of facts sufficient to put him on inquiry or to charge him with notice. No such warranty will be implied where the seller states enough to put one of ordinary intelligence on notice.

In *Weber Iron & Steel Co. v. Wright*, 14 Tenn.App. 451 (1932), it was held:

"In an action to recover the purchase price paid for secondhand iron pipe, where the seller was advised of purpose for which it was bought and purchaser had opportunity to discover and could have discovered defects, there was no implied warranty."

In *Gaar, Scott & Co. v. Young*, Tenn.Ch. App., 62 S.W. 631, it was held:

For breach of warranty measure of damages is difference between represented and actual value.

Section 47–2–316(3)(b), T.C.A., provides:

"(b) When the buyer before entering into the contract has examined the goods or sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him."

Counsel for plaintiffs insists that they were purchasing the mobile home for a particular purpose, to-wit, as a house in which to live, and that this fact was made known to the defendant and that there was an implied warranty that said mobile home was suitable for such purpose, and, further, that it was discovered by plaintiffs after they had purchased said mobile home that it was, in fact, not suitable for use as a home.

In the notes of T.C.A. § 47–2–315, Implied Warranty, it is said:

"2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. . . ."

Certainly, a mobile home or house trailer such as that involved here is customarily and ordinarily used as a place in which to live and there was nothing particular or peculiar about the use for which plaintiffs bought the trailer and we find nothing in

the record that indicates that defendant made any special representations as to its suitability for that purpose.

■ Thus, under the above authorities cited and quoted from, it would seem that there was no implied warranty as to defects which were plainly apparent to plaintiffs when they examined the trailer at least twice before buying it. Hence, it would seem that Assignment No. 3 should be sustained.

The Trial Judge rendered judgment for the return of the purchase price of the trailer, $1,500.00, to plaintiffs and a return of the house trailer to the defendant. Thus, his judgment is a rescission of the contract and an effort to restore the parties to statu quo.

■ It seems to us that this is error, as charged in Assignment No. 10, because the pleadings do not encompass a suit for rescission.

■ As a matter of fact, rescission is an equitable remedy and, as stated in 17A C.J.S. Contracts § 413:

"There is no arbitrary right to rescind a contract. The right is governed by equitable principles . . . ."

"*Consequences:*

"A court of equity will not rewrite or abrogate contracts to protect parties from those consequences which are attendant on their voluntary abandonment of contract and which consequences were reasonably foreseeable when contractual obligations were assumed. Minn.—*Liggett v. Koivunen*, 34 N.W.2d 345, 227 Minn. 114. . . .

"A contract cannot be rescinded merely because of the hardships imposed by its improvident character, or because the contract has become more burdensome in its operation than was anticipated, or because a party finds, in the light of changed conditions, that he has made a bad deal, or because he finds the contract less profitable to him than he had anticipated when the contract was made. . . ." 17A C.J.S. Contracts § 417, p. 509.

In *Pipkin v. Lentz*, 49 Tenn.App. 206, 354 S.W.2d 87 (1961), it was said:

"Mere inadequacy of consideration is not a ground for rescission."

"Right to rescind contract for fraud must be exercised immediately upon its discovery, and any delay in doing so, and continued employment, use, and occupancy of property received under contract will be deemed confirmation."

"Fraud is never presumed but must be proved."

As was said in *Donaldson v. Donaldson*, 557 S.W.2d 60, 62 (Tenn.1977):

"There is no duty on the part of the court to create a claim that the pleader does not spell out in his complaint. *Clark v. National Travelers Ins. Co.*, 518 F.2d 1167 (6th Cir. 1975). And where, as here, no claim for relief is stated by a party, a court may properly dismiss the action, either on motion or *sua sponte*. *Dodd v. Spokane County, Washington*, 393 F.2d 330 (9th Cir. 1968); *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 374 F.Supp. 450 (D.Md. 1974), aff'd 510 F.2d 1037 (4th Cir. 1975) cert. den., 422 U.S. 1948, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). Accordingly, the judgment of the trial court dismissing the action is affirmed. Costs incident to the appeal are adjudged against the appellant and his surety."

This was a completed transaction. The trailer was delivered and paid for after at least two personal inspections of it by plaintiffs before they paid for and accepted the trailer.

There is nothing in the pleadings nor in the proof to support a holding that plaintiffs were incompetent to make the contract and there is no charge of fraud and no finding of fraud on the part of the defendant in the opinion and decree of the Trial Court.

The Trial Judge expressed sympathy for the plaintiffs in having made a bad bargain and this Court shares that feeling of sympathy but is unable to find from this record that the plaintiffs were misled in the transaction or that they were incapable of know-

ing and understanding what they were doing.

For the reasons above indicated, we find it necessary to reverse the judgment of the Trial Court and dismiss plaintiffs' suit, but without prejudice to plaintiffs' right to file a suit in Chancery seeking rescission, but this is not to imply that a decree for rescission would necessarily be affirmed by this Court on this record if supported by proper pleadings.

REVERSED AND DISMISSED.

TODD and DROWOTA, JJ., concur.